**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **PRECISION WEATHER SOLUTIONS INC.,** | |
| **Plaintiff,** | **C.A. No.** |
| **v.** | |
| **HUDSON INSURANCE COMPANY; ODYSSEY GROUP HOLDINGS, INC.; AND DOES 1 THROUGH 10,** | **COMPLAINT** **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## PRELIMINARY STATEMENT

Plaintiff Precision Weather Solutions Inc., ("PWS" or "Plaintiff"), by and through its undersigned counsel, hereby files this Complaint ("Complaint") for trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA"); and trade secret misappropriation under the Kansas Uniform Trade Secret Act ("KUTSA"), Kan. Rev. Stat. § 60-3320, *et seq.*, against Hudson Insurance Company ("Hudson"), Odyssey Group Holdings, Inc. ("Odyssey"), and DOES 1-10 and demanding a trial by jury, alleges as follows:

## INTRODUCTION

1.      PWS brings this civil action to seek redress for the serious injury it has suffered from Defendants' misappropriation and use of PWS's valuable trade secrets. Since it was founded in 2012, PWS has worked tirelessly to develop its proprietary meteorological data services. Thanks to a suite of proprietary information, including software, applications, methods,

models, algorithms, and other intellectual property, PWS is alone at the leading edge of the precision meteorology and climatology data industry.

2.     Weather solutions were, and still are, key aspects to providing a platform for farmers. Weather represents 90% of the risk a farmer faces every crop year and accounts for 70% of the damage every crop cycle.  On-farm weather, crop models, and agronomy solutions are the foundation of the growing precision agriculture and ag-tech industries. The ability to provide a platform that addresses weather-related issues was, and continues to be, essential in the agriculture sector.

3.     This action involves a long-running nefarious scheme to misappropriate and leverage PWS's trade secrets to develop multiple crop insurance products.  Well before they ever received and made use of PWS's trade secrets, Defendants knew, or should have known that their partner, Farmers Edge, had engaged in a complicated strategy to pose as PWS's client for the sole purpose of obtaining access to and improperly misappropriating PWS's trade secrets. Likewise, Defendants knew – or at the very least, were willfully blind to the fact – that the insurance products they offered made improper use of PWS's trade secrets.  Without doubt, the insurance products and services at issue herein are the direct product of the misappropriation of PWS's trade secrets.  PWS seeks to hold Defendants accountable for their blatant participation in that misappropriation, the subsequent cover up, and the subsequent deployment of products and services that directly resulted from the misappropriation.

**THE PARTIES**

4.     PWS is a corporation organized under the laws of Canada with a place of business at 70 Arthur Street, Winnipeg, Manitoba R3B 1G7 Canada.

5.     Defendant Hudson Insurance Company is a corporation organized under the laws of Delaware, having an address at 1209 Orange Street, Wilmington, Delaware 19801.  On

information and belief, Hudson is the United States insurance division of co-Defendant Odyssey Group Holdings, Inc.

6. Defendant Odyssey Group Holdings, Inc. is a corporation organized under the laws of Delaware, having an address at 1209 Orange Street, Wilmington, Delaware 19801. Whenever in this Complaint reference is made to any actions of Defendants, such allegations shall mean that the directors, officers, employees or agent of said entity or entities did perform or authorize the alleged acts or actively engaged in the management, direction, and control of such entity and were acting within the course and scope of their employment.

7. Plaintiff is unaware of the true names and capacities, whether individual, corporate, associate, or otherwise, of defendant DOES 1 through 10, inclusive, or any of them, and therefore sues these defendants, and each of them, by such fictitious names. Plaintiff will seek leave of this Court to amend this Complaint if and when the status and identities of these defendants are ascertained.

## JURISDICTION AND VENUE

8. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiff alleges a claim under the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836; and 28 U.S.C. § 1338(b).

9. Additionally, this Court has supplemental jurisdiction over the state law-based claims for relief under 28 U.S.C. § 1367.

10. This Court has personal jurisdiction over Defendants because Hudson and Odyssey conduct business in this District on a regular and continuing basis. Hudson maintains an office in Overland Park, Kansas and Odyssey also continually operates in the District. This Court has specific jurisdiction over Hudson and Odyssey because they both possess the requisite "minimum contacts" with this forum, including but not limited to, the sale and/or offer for sale of products and services used in agricultural businesses in furtherance of the acts giving rise to this

litigation. Such acts include, but are not limited to, deploying and using the InsurTech product with "Smart Claim" and "Smart Reporting" sourced from Farmers Edge Inc. and/or its United States subsidiary Farmers Edge (US), Inc., ("FE") and used in conjunction with the FE platform FarmCommand, both products were created by trade secret misappropriation and marketed extensively within the District. Odyssey Reinsurance Company, Odyssey's American reinsurance subsidiary, also operates within the District by reinsuring policies sold by Hudson.

11.     Venue is proper in this District under 28 U.S.C. § 1391, because a substantial part of the events giving rise to this Complaint occurred in this District, and the Defendants are all subject to personal jurisdiction in this District.

**FACTUAL BACKGROUND**

**PWS Develops Valuable Meteorological Data Trade Secrets**

12.     PWS has specialized in precision meteorology and climatology as the focus for its business since its inception in 2012. PWS delivers proprietary solutions to a range of industries including agriculture, aviation, sports and entertainment, emergency response and preparedness, construction, and others.

13.     Shortly after its inception, PWS rapidly grew into a high-tech meteorology company, initially focused on serving the Great Plains agricultural industry. By 2013, sophisticated farmers knew that PWS's services would help lead to increased profit and crop yield.

14.     As a full-service meteorology company, PWS professionally deploys and maintains a variety of proprietary standardized stations and sensors for the observation of weather and soil systems, operating its own standardized private network that generates high quality meteorological data ("PWS Network"). PWS developed its system ("PWS System"), which incorporates sophisticated backend infrastructure designed to manage and ingest big data with billions of weather and soil data from the PWS Network and stations around the world. The

PWS System drives PWS's proprietary integrated platform ("PWS Platform") through and by delivering meteorological and other data ("PWS Data"), among other things. The PWS Platform encompasses proprietary software, applications, methods, models, algorithms and other intellectual property.

15. The PWS Service incorporates the PWS Network, PWS System, PWS Data, and PWS Platform, which all incorporate PWS's Trade Secrets, confidential and proprietary information and intellectual property. The PWS Service, including PWS's Trade Secrets, was developed based on substantial years of experience and expertise of its founder and employees in various technical areas. PWS's trade secrets (hereafter referred to collectively as the "Trade Secrets") include, but are not limited to:

a) A system or network of meteorological and climatological station and sensor devices, soil sensors, industry standards, network design, meteorological data, deployment and maintenance methods, protocols, and practices to assess and forecast climate and environmental patterns and conditions; more specifically, the Trade Secrets include and encompass the specific proprietary design and implementation of PWS's meteorological station and sensor devices, as well as their deployment, maintenance, and data collection protocols;

b) Information systems and systems architecture, software development, application software and application programs, software interfaces, large-scale proprietary data and protocols for managing big data, quality assurance and control data methods and procedures, application programming interfaces ("APIs"), algorithm formation and modeling, graphic user and user interface design and development, and application development; more specifically, the Trade Secrets include and encompass the proprietary architecture of the PWS Platform, the PWS Platform software, and PWS's aggregated data from the PWS Network;

c) A proprietary weather alerting methodology, which includes customized weather alerts; and

d)      Application of meteorology and climatology to industries, particularly the agriculture sector, understanding and assessment of customer needs and requirements, creation of interpretation tools driven by sophisticated science, commitment to research and development, and other expertise, more specifically, the Trade Secrets include and encompass the proprietary algorithms and parameters underlying PWS's crop growth and crop risk models of the PWS Platform.

16.     PWS licenses access to the PWS Platform on a subscription basis, as a Platform as a Service ("PaaS") per single-user, non-transferable license.  PWS issues confidential login credentials for each license to a named single-user.  In order to access the PWS Platform, each and all users must agree to comply with the PWS Terms of Service ("ToS").  If the license also includes PWS's proprietary agronomy solutions, then the licensee must further agree to the PWS Agronomy ToS. For continued access to the PWS Platform, the licensee must further agree to any updates to the PWS ToS and the Agronomy ToS, wherever applicable.

17.     The PWS trade secrets are valuable.  PWS's capabilities are unique in the industry. In an email to FE employees in October 2014, the CEO stated: "This [PWS Service]is a very high level premium service, there is nothing as we understand available like this on the market in Canada today." Similarly, in March 2015, FE's Chief Marketing Officer stated that "PWS provides much more accurate data, because it uses a number of forecasting models.  It is MUCH BETTER and MORE ACCURATE than ClimatePro product from Climate Corp."

18.     To protect the value of their Trade Secrets, PWS has taken reasonable measures to keep its proprietary technology secret.  The company's technology solutions are only accessible through contractual agreements with PWS, which, as described in more detail below, contain strict confidentiality provisions.  Through these agreements and related Terms of Service Agreements required to be executed prior to obtaining access to the PWS Platform, PWS strictly prohibits sharing of login credentials or individual accounts and strictly prohibits account holders

from retransmitting, reproducing, copying or otherwise distributing or exhibiting its Trade Secrets.

## FE Approaches PWS for Services under False Pretenses

19.     FE is an agronomy services company founded in 2005.  It offered primarily agronomy consulting services like soil sampling and crop scouting, but it did not have the ability to compete because it lacked the capability, expertise, or resources to develop the kind of competitive software solutions (like PWS had) sophisticated farming clients were increasingly demanding.  FE did not have its own valuable intellectual property that could attract investors.

20.     The story of Defendants' misappropriation and improper use of PWS's Trade Secrets begins with their affiliate and partner, FE.  In the beginning of 2014, FE was an agronomy services company struggling to differentiate itself in a competitive marketplace.  FE, a Canadian firm with a wholly owned United States subsidiary called Farmers Edge (US), Inc., had limited ability to compete in the rapidly emerging and disruptive precision agriculture technology boom.  For example, FE had no internal capability, expertise, or resources to develop competitive software solutions and, as a result, faced inevitable failure.

21.     Around this time, there was a keen demand in the agriculture sector for an all-in-one platform incorporating field crop records, farm equipment telematics data management and field records, Variable Rate Technology and yield mapping, and satellite remote sensing.  PWS met this need, offering its unique platform with weather solutions, growth stage mapping, and predictive tools.  FE knew it did not have the capability to independently create a similarly valuable product to compete with PWS.  At the time, a successful FE sales employee named Dale Steele stated that FE had no in-house software development capabilities to develop the necessary technology for an "all-in-one" platform for the ag-tech industry.  However, FE knew of one company that did have these capabilities: PWS.

22.     FE misled and deceived customers and investors by representing that it had a yet-to-be developed platform in the works to be called "FarmCommand."

23.     FE needed the superior capabilities of the PWS Service to survive in a tough market, and after previously making unrealistic promises to clients and investors about its technological capabilities. In internal correspondence from March 2015, FE management acknowledged the real motivation for approaching PWS: PWS provided "much more accurate data" than anything else that was on the market. FE feigned interest in becoming a lawful PWS licensee in order to advance its real strategy: to misappropriate PWS's Trade Secrets to develop the platform that would become FarmCommand and finally be able to compete with PWS.

24.     In 2014 and 2015, FE entered into a series of agreements with PWS that entitled FE to subscribe to and use PWS's platform. In order to protect its Trade Secrets, PWS, consistent with its standard practices, required FE to agree to strict confidentiality terms.

25.     As PWS would later learn (much to its detriment) FE never intended to honor its agreements—it just wanted access to the "black box" of PWS's valuable trade secrets so it could create its own competing product. FE could not fairly compete in the marketplace, so it resorted to brazen misappropriation.

26.     The contracts between PWS and FE extended to and encompassed the PWS Services, including but not limited to: the PWS System, PWS API, PWS Data, deployment methods, deployment of the meteorology network, and subscription licenses to the PWS Platform for meteorology and agro-meteorology solutions.

27.     The agreements included terms intended to protect PWS's proprietary intellectual property, including the Trade Secrets. The agreements contain numerous restrictive and prohibitive terms and conditions, confidentiality provisions, and prohibit FE from reselling, sub-licensing, retransmitting, reproducing, copying or otherwise distributing or exhibiting PWS's Trade Secrets, confidential information and proprietary information, and intellectual property,

including information related to the deployment of the network, PWS API, PWS Data and PWS's Platform. The agreements further prohibit FE from using PWS's Trade Secrets, confidential information and proprietary information, and intellectual property to create weather and weather-related products. The agreements between PWS and FE further obligated FE to protect and maintain the confidentiality and security of PWS's Trade Secrets, confidential and proprietary information and intellectual property, including, but not limited to: technology, network, systems, data, trademark, copyright, and proprietary materials.

**FE Creates an Unlawful Competing Product Using PWS's Stolen Trade Secrets**

28.     Almost immediately after gaining access to the Trade Secrets, FE personnel began to discuss their plans to compete with PWS.  For example, on April 24, 2015, FE COO Trevor Armitage emailed other high-level employees that "at this point [PWS] believes that they have a long term relationship with us. We cannot have it get out to them that we will be going to our own viewer. This well severely impact the plan for the month of [M]ay."  Just a few minutes later, FE Chief Marketing Officer Marina Barnes responded: "Agree, we have to be very careful with this.  Let's focus on PAM[1]  and FarmCommand in this document and leave PWS out of it for now."  Patrick Crampton, who had recently joined FE as the Chief Product Officer, replied: "Agreed, thanks for flagging the sensitivity.  OK, agreed.  My thought was to make this into more than a FC vs PAM but not worth it based on the risk of a fallout with PWS right now."

29.     Accordingly, Crampton drafted an announcement about the FarmCommand rollout that was to be distributed company-wide within FE.  This announcement did not refer to PWS at all.  In the same email, Crampton left an additional note in bold font "For this audience

---

[1] "PAM" was FE's terminology for their own inferior product.  As Crampton explained in an April 24, 2015 email, "Further development efforts will be dedicated to moving the functionality of the current FarmCommand interface to what is today known as PAM.  Upon completion, PAM will be rebranded as FarmCommand."

only"—meaning those FE employees who were on the email chain—in which he mentions the "PWS upgrade."

30.     Relatedly, on the same day, Mr. Barnes responded in a separate email to a dissatisfied FE employee: "A Farmers Edge proprietary solutions growth stage, disease and weather app are not built as of yet.  Dan Heany and his team will be working to develop these tools.  A Farmers Edge weather app connected to our PAM solution is also being developed and will be launched this fall but for now we will be suing [sic] PWS solutions until then.  Who told you these solutions were not built yet?  I need to know so I can provide them the correct information."

31.     By at least as early as June 2015, FE began to recreate PWS's Solutions including crop and risk models on a new FE Platform.  FE needed PWS's capabilities to survive in the market, and it was backed into a corner after previously promising clients and investors that FE had a working FarmCommand product that could go toe-to-toe with PWS.

32.     Ron Osborne, a resident of Nebraska who was then Vice President of FE and later CTO and Chief Product Officer, led a scheme to take and use the technology of PWS to develop the competitive platforms FE would eventually call FarmCommand and InsurTech.  Osborne came to FE when FE acquired Osborne's company, Crop Ventures (which had been headquartered in Omaha), in early 2015.

33.     Osborne set out the misappropriation scheme in a six-page plan dated June 22, 2015 that states in pertinent part:

> "Considering that these [weather] stations are owned by FE, I was surprised that the website is entirely PWS with no FE branding.  I would suggest that weather data and crop information be integrated and be made available on a common platform, branded as FE.  Further integration would move towards crop models that are specific to field locations, field operations (ie: initialized on planting

date), and crop observations (growth stages, scouting) . . . Goal to provide a minimum of the existing PWS offerings, including the nine currently-offered models on a new FE platform."

34.     FE systematically used the PWS Platform to develop FE's platform, FarmCommand, and subsequently, InsurTech. The newly acquired FE software team through GranDuke Geomatics, misused PWS's technology to build its FarmCommand platform, including the PWS System.  FE employees knew that customers wanted a weather-related and agronomic integrated platform, and FE employees had promoted and promised prospective customers in 2014 and throughout 2015 that they would have such a platform.  But without PWS's Trade Secrets, FE simply could not create such a platform.

35.     By early 2015, FE's customers were growing "uneasy" in the words of one FE employee named Katie MacMillan, who passed along a message that FE's second largest customer in Canada was disgruntled about FE's delay in installing weather stations on the customer's farms.  MacMillan warned that this customer had ties to "one of the richest men in the country" and that "if delivery isn't met immediately," the customer "has a large network that negative feedback for Farmers Edge could easily spread through. [sic]"  To underscore her point about customer dissatisfaction, MacMillan noted that "my next 5 largest customers have also been giving me signs of non-confidence in our ability to deliver on the Precision Solutions packages."  FE was clearly feeling the pressure to deliver a product it had no hope of developing independently.

36.     In an attempt to stem the tide of customer dissatisfaction, FE misappropriated of PWS's Trade Secrets and the subsequently used those trade secrets to develop and implement FarmCommand and InsurTech.

37.     By November 2015, FE used PWS's growth stage thresholds for a template of a growth model and was pursuing risk models for integration into its own products to be called FarmCommand and InsurTech.

38.     For about 11 months, unauthorized FE employees and contractors had unrestricted, carte blanche access to PWS's services including—but not limited to—the PWS Platform. FE took and used numerous screen shots of the PWS Platform to create copies for their platform, and used the unauthorized access to the PWS Services in the development of FE's all-in-one platform, FarmCommand. For about 16 months, FE also had access to PWS's methodology in setting up and deploying real-time stations and sensors, logistics, meta data and meta data collection and other critical operations. Once FE misappropriated PWS's services including PWS's proprietary and confidential technology, FE applied the methodology and processes to other types of data, models, and applications.

39.     Osborne oversaw a team that knowingly and intentionally provided unauthorized access to PWS's Trade Secrets, in violation of FE's confidentiality obligations to PWS. For example, on April 25, 2015, Kevin Grant, CTO of GranDuke Geomatics (the company FE had recently acquired to work on the FarmCommand platform), emailed FE staff, "Hey Gents, Any chance I could get a login to PWS? That way, I can at least see what data is available, and build our interface accordingly." Chief Product Officer Patrick Crampton replied, "If it's possible i'd like to have a view as well." Curtis Mackinnon replied instructing another employee, Matthrew Bollman, to "send Kevin and Patrick my weather login" which Bollman did the next morning.

40.     Once Grant got the login credentials he requested, he responded to Bollman on April 26, 2015, writing: "Hi Matthew This is really helpful, thanks. A couple of notes: 1) As soon as you guys have access to the premium site, please let me know, as **we'll want to incorporate that data into our dashboards as well.**" (Emphasis added.)

41.     Other senior FE employees were likewise granted unauthorized access to the PWS Platform. In a May 2015 email with the subject line "getting ready for Russia," Mr. Barnes instructed unauthorized employees Sergey Sherstyuk and Chacko Jacob (FE's CIO) to "get the access to weather information.  This is the access that Curtis has, we want to show case all the weather stations data [and] insure we are comfortable with the new [PWS] crop models…" Sherstyuk replied: "Hello Wade, I have access to PWS, Curtis sent me it."

42.     Unauthorized access extended beyond FE employees and was rampant.  In one June 11, 2015 email, FE's Director of Agronomy emailed former FE CTO Curtis McKinnon asking if he could share PWS login credentials with a contractor, writing: "I want to give Andy Nadler an agromet specialist we have on contract access to the PWS dashboard, Can we use your account for that. He will take a look at the PWS system and start to put together a plan to transition to an inhouse system."

43.     The Andy Nadler referenced in the email above is agricultural meteorologist Andrew Nadler, who wrote in a report to FE from in or about July 2015 that:

> The initial release of the FE dashboard should have a minimum of the products
> and features that are currently available on the PWS dashboard.  PWS's main
> page displays current conditions, watches and warnings, an hourly and daily
> forecast, a radar map, and a weather-related news feed.  For models, PWS offers
> basic growth models for wheat, barley, canola, corn, forage, and potato . . .
> These algorithms can be implemented quite readily in a new FE dashboard . . .
> For the initial release of the FE dashboard, include a minimum of the features that
> are currently available on the PWS dashboard.

44.     On November 9, 2015, Nadler, sent an email to FE personnel confirming that PWS's Trade Secrets had been used in developing FE's "dashboard", writing that, "[r]egarding the growth stage thresholds, I've stuck fairly closely to which PWS had…I have some

apprehension about some of the numbers, but I also don't have good data to prove them otherwise. So it's a matter of using what we have."

45.     Three days later, FE's Vice President of Global Agronomy Daniel Heaney sent a similarly candid email, noting that "Stage 1 will be replicating the capability of the current PWS system with some refinements."

46.     Here we have high-level FE employees and contractors admitting that, while they did not know exactly what made PWS's products run, they were happy to add a new coat of paint and market their own competing version.

47.     Once FE had improperly used PWS's Trade Secrets to develop its own product, the company began to renege on its agreements with PWS. As soon as FE got what it really wanted from PWS, FE stopped paying its bills. By late 2015, FE owed PWS in excess of $1.2 million in long outstanding invoices and contract terms, which has since increased based on contractual interest.

48.     In November 2015, FE unexpectedly terminated its agreements with PWS—citing several bogus causes—and filed suit against PWS in the company's native Canada, alleging a series of contractual breaches. FE brought these claims despite being in material breach for failing to pay long-overdue invoices. FE's bogus termination and the Canadian lawsuit was part of its broader strategy to steal PWS's Trade Secrets and weaken PWS as a competitor.

49.     At the time of the lawsuit, PWS still had no idea that its Trade Secrets had been misappropriated, nor did it know about the plans to develop a competing product spearheaded by Osborne. As detailed below, PWS would not learn its Trade Secrets had been misappropriated by FE until it obtained documents in discovery from FE in the Canadian litigation years later, on June 15, 2021. Until that time, FE had been in violation of orders from the Canadian court to produce these documents for years, and had submitted false declarations to the court (upon

which the court relied in declining to issue a preliminary injunction in PWS's favor) to the effect that FarmCommand was not based in any way upon PWS's Trade Secrets.

50.     However, PWS did not through reasonable diligence have any reasonable suspicion that the separate product of Defendants, Insurtech was based upon its Trade Secrets or that Defendants had received any of its Trade Secrets until well after June 15, 2021.

51.     Once FE had created its FarmCommand platform—which it could not have created without taking PWS's Trade Secrets—FE sought to make up ground on PWS in the market by implementing a predatory and anticompetitive "penetration pricing" marketing strategy, whereby it offered FarmCommand to clients at low or no cost.  This strategy was designed to gain market share and push aside PWS, which had gone to market first with a valuable product it had independently developed through years of hard work and which utilized its Trade Secrets.

**The Defendants Knowingly and Willfully Implement the Stolen Trade Secrets into Their Own Insurance Services and Products**

52.     Building off of the FarmCommand platform, FE created a secondary platform called InsurTech[2], along with two crop insurance solutions called "Smart Claim" and "Smart Reporting."  FE launched the InsurTech platform and brand in or about early 2021.  This is the part of the story where Defendants—Hudson and Odyssey—come in.  Hudson is the United States subsidiary of Odyssey.  In turn, Odyssey is approximately 95%-owned by Fairfax Financial Holdings, Ltd. ("Fairfax") a multibillion-dollar company headquartered in Toronto, Canada.  Fairfax is a holding company, primarily engaged in property and casualty insurance and associated investment management through its subsidiary, Hamblin Watsa Investment Counsel.

---

[2] Although Defendants branded their product as "InsurTech", the term is a generic one used throughout the insurance industry.

53.     In or about January 2021, FE partnered with Hudson to deploy and use InsurTech throughout the United States in Hudson's lucrative crop insurance business.  FE's announcement of the partnership stated that Hudson would use "the unique digital infrastructure from Farmers Edge, complete with robust datasets and predictive tools."  FE and Hudson, of course, left out the "unique" infrastructure they boasted of was not unique at all; it was stolen directly from PWS.

54.     Hudson is the insurance division of Odyssey, and Odyssey is involved in the advertising and selling of InsurTech.  In a January 21, 2021 press release, Odyssey crowed of the partnership between Hudson and FE, writing that FE's "unique digital infrastructure" would create "new connectivity in crop insurance."  This press release (available at https://odysseygroup.com/news/unique-digital-infrastructure-creates-new-connectivity-in-crop-insurance/) also boasted about Smart Claim:

> This partnership goes far beyond automating acreage and production reporting. Agents and growers will also gain access to Smart Claim, a highly intelligent tool that layers field-centric weather and imagery data with artificial intelligence, to predict the possible strike of disaster across insured acres. The tool modernizes the claim life cycle for all stakeholders, from detection and submission to estimation and adjudication.

55.     Approximately six months following the announcement of the partnership with FE, Hudson analyst Avery Cook gave a presentation at the June 2021 CAS Reinsurance Seminar, extolling the virtues and value of crop models and weather, thereby illustrating the value of the stolen Trade Secrets.  As Cook stated: "A crop model can leverage existing experience data with other data sources" and "crop models can also be used to test the impact of potential/hypothetic changes to these factors in advance" whereas historical results have limitations. The presentation also stated: "Weather information is not available at all geographic locations only at weather

stations (gridded data etc. can help as long as volatility is maintained)" which is the underpinning of PWS's trade secrets, capabilities and technology that FE did not possess prior to inducing PWS into the agreements that strictly prohibited FE from creating any weather or weather-related products and using PWS's Trade Secrets through its subscriptions.

56. Hudson and Odyssey's crop agents used InsurTech in performing their crop insurance business. The "Smart Claim" feature of InsurTech in particular embodies the value added from the exploitation of PWS's Trade Secrets. As FE publicized when launching InsurTech and Smart Claim, the insurance product would use "a highly intelligent tool that layers field-centric weather and imagery data with artificial intelligence, to predict the possible strike of disaster across insured acres." Smart Claim, which would never have been developed without the misappropriation of PWS's Trade Secrets, was a cornerstone feature of FE's partnership with Hudson.

57. Hudson promoted its relationship with FE and touted FarmCommand and Smart Claim in the summer issue of its publication Crop Sense Magazine, describing the features in detail as shown in the graphic below:



**SMART REPORTING**

- The Farmers Edge automated reporting tool facilitates seamless data transfer from the field providing superior user experience. Farmers Edge digitizes the farm with connected field sensors to collect data required for crop insurance passively on behalf of the grower and validates it at key points.
- FarmCommand®, integrated digital platform, records planting events per day, easing the process of reporting acreage by field, replanting, first crop/second crop reporting, prevented planting, and more.
- With a simple click, growers can forward acreage and production information directly to their agent.

**SMART CLAIM**



- Get access to severe weather detection tools to proactively manage the claims notification process to the agent.
- Utilize unique imagery-derived map layers and automatic crop health change detection tools to assess potential crop damage.

58.     Odyssey is a worldwide underwriter of property and casualty reinsurance and specialty insurance.

59.     Agricultural insurance is big business.  As described above, weather variation—which cannot be controlled—still represents a massive risk to farmers despite the enormous advances in recent agricultural technology.

60.     For the year ending December 31, 2023, Hudson generated gross premiums of $2.4 billion, with 32% of gross premiums in crop insurance.  Hudson derives over 30% of its annual revenue from crop insurance, and also accounts for over 40% of its parent company Odyssey's total revenue.  Odyssey principally operates as commercial line underwriters in the United States through Hudson Insurance.

61.     Because weather is unpredictable and can profoundly impact farmers' yields and income, crop insurance is a cornerstone of United States farm policy, with farmers paying

between $3.5 and $4 billion annually for federally guaranteed coverage. According to the Federal Crop Insurance Corporation ("FCIC"), in order for a company to qualify as an Approved Insurance Provider ("AIP"), an insurer must demonstrate that it has the requisite financial and operational resources to meet complex program requirements including but not limited to: organization depth and experience, financial capacity, internal controls, and technical skills and capabilities. Hudson is an AIP.

62.     There is essentially no plausible way that Hudson and Odyssey could not fulfill their diligence requirements as AIPs without gaining intimate knowledge of FE's misappropriation of PWS's trade secrets. All AIPs are required to execute a Standard Reinsurance Agreement ("SRA") with the FCIC. The SRA governs the business and financial relationship between FCIC and the AIPs, including the terms and conditions by which the FCIC will provide administrative and operating expense reimbursement and reinsurance on the eligible contracts sold by the AIPs. Once approved, ongoing participation is conditioned upon satisfactory performance.

63.     AIPs are required to undertake thorough and comprehensive due diligence on all affiliates. The FCIC's definition of "affiliate" service providers would cover the partnership between Hudson and Farmers Edge. Further, the United States Department of Agriculture's Risk Management Agency ("USDA-RMA") requires AIPs to annually submit documentation on their plan of operations in accordance with the SRA requirements. Appendix II of the USDA-RMA reporting requirements for AIPs includes key sub-sections of section IV, including (l) the E-Business Plan, (m) the IT architecture and operating environment, and (n) records management/security and compliance with the Federal Information Security Management Act ("FISMA"). The customer data that insurance companies, including AIPs, collect is private and highly sensitive. The partnership between Hudson and FE directly involves farmer data which is regulated by the USDA-RMA. For this reason, if Hudson were compliant with the USDA-RMA

regulations (as well as the FCIC's regulations), then it should have conducted thorough due diligence on the origin of the accused InsurTech solutions including Smart Reporting and Smart Claim. Had Hudson performed this due diligence, it would have learned that InsurTech was based on PWS's misappropriated trade secrets.

64. The Defendants operate as insurers and affiliates within an insurance holding company system as defined in the Insurance Holding Company System Registration Act, 18 Del.C. Chapter 50.

65. The National Association of Insurance Commissioners (the "NAIC") and the State Departments of Insurance in each state in which Odyssey and Hudson operate regulate these companies. Under the direction of the NAIC, the Delaware State Department of Insurance led a multi-state examination of all subsidiaries of Fairfax—the parent entity of both Hudson and Odyssey. The examinations of Hudson and Odyssey were undertaken in accordance with the NAIC Financial Condition Examiners Handbook and the Delaware Market Conduct Examination. The Financial Condition Examiners Handbook is extensive, and is described as: "The Handbook requires that the examination be planned and performed to evaluate the financial condition, assess corporate governance, identify current and prospective risks of the Company, and evaluate system controls and procedures used to mitigate those risks." This includes partnerships, vendors, and suppliers as well as information systems and technology. Had Hudson and Odyssey been compliant with these regulatory requirements, then they would have found the misappropriation of PWS's Trade Secrets. Furthermore, according to the Marked Conduct examination report of Hudson states that Hudson conducts audits on its external partners under the direction of senior management. Hudson also has a procedure, as required by regulation, for continuous vendor oversight and control. Hudson's procedures for audits, disaster recovery, training, sales and marketing are all governed and placed by Hudson's parent company, Odyssey.

If the Defendants had taken these audit procedures and regulations seriously, they doubtless would have discovered that FE had blatantly stolen PWS's Trade Secrets that formed the entire foundation of FarmCommand and its progeny, InsurTech.

66. The Defendants are intrinsically intertwined operationally. This relationship extends across the subsidiaries and affiliates of Fairfax throughout the United States. The reports of examination identify multiple inter-company agreements across all the subsidiaries to provide inter-company services, which includes but is not limited to: shared information technology and systems, managed and operational functions, tax allocation and investment services. These cooperative agreements are approved by the NAIC.

67. Because of the stringent NAIC and state insurance regulations to which they were subject, Odyssey and Hudson knew or had reason to know that InsurTech was misappropriated from PWS, utilizing PWS's Trade Secrets.

68. It is clear that Defendants' stringent due diligence requirements meant that they either did discover, or should have discovered, that they were using misappropriated trade secrets in their business. Aside from due diligence, however, there is another, more basic reason that Defendants must have known they were misusing PWS's Trade Secrets: in 2021, FE became a public company and its initial public filings showed that Defendants' parent entity, Fairfax, had pumped investments of nearly CAD$400 million into FE and had amassed pervasive influence over FE's Board.

**Defendants' Investment into and Connection with FE**

69. Unbeknownst to PWS, Fairfax had taken an interest in FE as early as 2015. This was revealed in Fairfax's 2020 Annual Report, published after FE's IPO, where Fairfax stated that it had "nurtured" FE since that time. A review of the public record since the IPO of FE reveals that Fairfax provided substantial financial backing for FE, and incrementally increased its

influence over the company until it ultimately assumed complete control following the IPO in March 2021.

70.     Fairfax's first equity investment of USD$95 million was announced in December 2016, orchestrated by Hamblin Watsa Investment Counsel, the investment manager for Fairfax subsidiaries.  Fairfax's due diligence prior to deciding to make this initial substantial investment into FE, which at that time had very limited sales and revenues (only CAD$5.5 and CAD$8 million in sales in 2014 and 2015 respectively), must have entailed a close review of FE's newly released FarmCommand product and the agreements that FE had with PWS, which specifically prohibited FE from developing weather related products or otherwise using PWS's Trade Secrets.

71.     Fairfax and its subsidiaries, including Odyssey and Hudson, report on a consolidated basis to the U.S. Securities & Exchange Commission (the "SEC").  In 2021, the companies' report stated that Fairfax, through its subsidiaries, had been "nurturing" FE since 2015. Between 2017 and 2021, through 11 of its subsidiaries—including Odyssey—Fairfax invested about $400 million into FE, giving it a controlling interest of over 60% and control of the FE Board of Directors (Fairfax began installing Directors on FE's board as early as 2015).

72.     Of Fairfax's 11 subsidiaries (seven of which are U.S. insurance and reinsurance companies), Odyssey is the largest investor in FE.  Between 2017 and 2021, Odyssey provided FE with a series of loans and convertible debentures totaling $85.9 million.  The loans were due to mature on June 30, 2021.  Through FE's IPO in March 2021, Odyssey converted its loans to common shares and recognized a gain of over $11 million upon conversion of the loans.

73.     In Odyssey's audited 2022 Financial Statements, the company stated it then impaired its investment in FE in the amount of $75.3 million less than a year later on December 31, 2021.  It further impaired its investment to $9.4 million on September 30, 2022.  Despite impairing its investment, Odyssey loaned FE $5.9 million under a new credit facility, which

bears interest at 6% per annum, maturing on January 31, 2025.  Today, FE's market cap is less than $9 million and it cannot repay its debts.

74.     According to Fairfax's ESG Report for 2022, due diligence is undertaken by cross-country teams and is leveraged across subsidiaries for every acquisition. The report states:

> "Whenever a new product is introduced into our environment, it is the responsibility of the individual organization to ensure proper due diligence surrounding security of the product is performed. If the product is already in use at another entity within the group, any due diligence already completed can be leveraged accordingly. At the Fairfax head office level, a security assessment of any significant product is performed by qualified cybersecurity professionals before contracts are signed. At a subsidiary level, compliance with the regulatory guidelines of the jurisdiction in which they operate is kept in mind when assessing their third-party vendor relationships particularly if the product would involve handling personal confidential information of their employees and customers."

75.     Fairfax's ESG report also represents that its subsidiaries—including Odyssey—participate in an IT Working Group, with CIOs from all the operating companies participating in monthly meetings.  The IT Working Group oversees critical areas, including but not limited to: cyber security, IT infrastructure and information security management systems, and data and disaster recovery, and data protection.  The governance and reporting structure described in the ESG Report along with the oversight and initiatives of the IT Working Group mean that Odyssey and Hudson would have been acutely aware of the misappropriation of PWS's Trade Secrets.

76.     However, given Odyssey's large investment in FE and year-long project of "nurturing" FE's growth, the company was at the very least willfully blind to the theft of PWS's Trade Secrets.

77. Furthermore, Odyssey's investment would have required significant due diligence and, if it followed the process for acquisitions described in the Fairfax ESG Report and as required by both the USDA-RMA and NAIC regulators, then the misappropriation of PWS's trade secrets in both FarmCommand and InsurTech were known by Odyssey and Hudson and would have been known prior to Hudson entering into a partnership with FE.

78. Hudson is the only U.S. subsidiary that sells crop insurance in the U.S. which is also guaranteed by the U.S Government, Department of Agriculture, through the Farm Bill which is designed to protect U.S. farmers. In addition to the federal guarantee, AIPs receive substantial subsidies for operating the federal crop insurance program which have amounted to over $100 million per year for Hudson in the last several years.

79. The partnership with FE, given the unique nature of PWS's Trade Secrets, provides Hudson with material advantage over its competitors, facilitating an increase in gross premiums written and subsidies.

80. Aside from standard due diligence that would have uncovered the Trade Secret theft, Hudson knew or had reason to know InsurTech was based on stolen intellectual property. Hudson has regulatory obligations to routinely review its vendors and suppliers in accordance with the NAIC. Given the close partnership between Hudson and FE, it is improbable that Hudson was unaware of the trade secret theft by FE and the improper use of PWS trade secrets to make, sell, and deploy InsurTech. On information and belief, Hudson knew that InsurTech was acquired by improper means by FE.

81. Odyssey knows or has reason to know that InsurTech is based upon the misappropriated Trade Secrets for the same reasons that Hudson has such knowledge. Fairfax publishes its ESG Report on a consolidated basis. A portion of the report focuses on training and for 2021 and 2022 states as follows Odyssey: "Odyssey Group frequently engages with its customers by providing educational material. In addition, a variety of programs are delivered by

live webinars on timely subjects, such as emergency preparedness programs. They also have a risk management portal for their clients where clinical, legal, and regulatory updates and information is shared. Additionally, Odyssey Group provides a substantial amount of online and in-person training to U.S. crop insurance agents."

82.     In the partnership announcement published by the Defendants, Hudson CEO states: "Crop insurance is our biggest business unit, and we've made a strategic move with Farmers Edge to augment our technical capabilities, enable better risk management, and provide a differentiated and enriched experience to our agents and growers," said Christopher Gallagher, President and Chief Executive Officer at Hudson. "By working together, we're helping our agents diversify and harness the power of digital to build resiliency and set ourselves apart from the competition."

83.     Based upon the nature of the partnership as described by Hudson and Odyssey, the due diligence requirements of the almost $100 million Odyssey invested into FE, ongoing multiple intellectual property-related litigations involving FE, the stated information technology and cybersecurity governance described by Fairfax, as well as regulatory requirements of the NAIC and other regulators and ratings agencies, Hudson and Odyssey were well aware of the misappropriation of PWS's trade secrets by FE orchestrated by Ron Osborne and his team.

**Through Discovery in Canadian Litigation, PWS Learns of FE's FarmCommand Misappropriation Scheme**

84.     Though Hudson and Odyssey were uniquely positioned to easily obtain the information much sooner, PWS did not learn of FE's scheme to misappropriate its Trade Secrets in the development of FarmCommand until at earliest June 15, 2021, when FE finally produced a trove of documents in the Canadian litigation initiated by FE that directly contradicted sworn statements of its executives denying any misappropriation. Until then, FE had resisted multiple court orders to produce the documents. Likely because it knew how damaging these documents

were, FE fought hard to keep them hidden, flagrantly violating court orders until it was finally forced to produce them on June 15, 2021. However, none of the documents produced on June 15, 2021 by FE related in any way to the misappropriation of PWS's Trade Secrets as they related to InsurTech or related products marketed by Defendants. PWS did not through reasonable diligence have any reasonable suspicion that Insurtech was based upon its Trade Secrets or that Defendants had received any of its Trade Secrets until well after June 15, 2021.

85.     In addition to defying the Canadian court's multiple orders to produce documents, FE also submitted false affidavits that the court relied on in denying an injunction sought by PWS. On March 18, 2021, the Canadian court held that PWS had not demonstrated the requisite *prima facie* merits of its case. In reaching this conclusion, the court noted that "[a]ffidavits have been filed by representatives of FE that they did not use any information gleaned from PWS when they developed FarmCommand." Once FE was finally forced to produce documents a few months later, however, it became clear for the first time to PWS that these affidavits the court relied upon were flatly false.

**PWS Suffers Irreparable Harm from the Misappropriation of Its Trade Secrets**

86.     PWS's business model relies upon sophisticated weather and soil stations, high-quality observation data, worldwide data collection and analysis, complemented by PWS's complex, proprietary platform. PWS did and continues to charge customers at fair market value for stations and/or subscription licenses. Once Osborne and his team misappropriated PWS's services, FE aggressively and unfairly elbowed its way into the market, offering its "new" services in direct competition to PWS. In an effort to make up ground on PWS, FE offered its copycat product at little to no cost.

87.     FE failed to acquire the PWS technology through legal means. Instead, Osborne and his team orchestrated the unlawful misappropriation of PWS's Trade Secrets, confidential and proprietary information and intellectual property. At the same time, Odyssey and its

corporate affiliates were "nurturing" FE by pouring hundreds of millions of dollars in capital into the company and coordinating strategic partnerships.

88.     FE then built a secondary and interrelated platform, InsurTech, which it licensed to Defendants for use in their lucrative crop insurance business.  Because of their cozy corporation relationship with FE and their stringent due diligence requirements, Defendants doubtless knew that FarmCommand and InsurTech was based on stolen trade secrets. Defendants deliberately chose to "look the other way."  Defendants knew that FarmCommand, and InsurTech (with its attractive Smart Claim features) had been misappropriated, but they also knew that these products would draw in customers.  Defendants nevertheless chose to enrich themselves at the expense of PWS.

89.     The PWS Trade Secrets continue to be misappropriated in FarmCommand and InsurTech, which Defendants marketed in this District and throughout the United States.  In their January 2021 announcement of the partnership with Hudson, FE claimed there are 291 million acres with crop insurance in the United States that the company is targeting across the United States.

90.     Defendants' misappropriation of PWS's Trade Secrets has caused PWS significant harm and has displaced PWS's well-earned position as the market leader in agricultural meteorological data service solutions.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

## <u>MISAPPROPRIATION OF TRADE SECRETS UNDER THE</u>

## <u>DTSA (18 U.S.C. § 1836, *et seq*.)</u>

## <u>(Against all Defendants)</u>

91.     PWS hereby incorporates each of the foregoing Paragraphs of this Complaint, inclusive, as if set forth fully herein.

92.     PWS owns substantial and valuable Trade Secrets, as alleged above.

93.     PWS's Trade Secrets relate to products and services used, sold, and/or ordered in, or intended to be used, sold, and/or ordered in, interstate commerce including in this judicial District.  PWS's Trade Secrets include but are not limited to:

a)      A system or network of meteorological and climatological station and sensor devices, soil sensors, industry standards, network design, meteorological data, deployment and maintenance methods, protocols, and practices to assess and forecast climate and environmental patterns and conditions; more specifically, the Trade Secrets include and encompass the specific proprietary design and implementation of PWS's meteorological station and sensor devices, as well as their deployment, maintenance, and data collection protocols;

b)      Information systems and systems architecture, software development, application software and application programs, software interfaces, large-scale proprietary data and protocols for managing big data, quality assurance and control data methods and procedures, APIs, algorithm formation and modeling, graphic user and user interface design and development, and application development; more specifically, the Trade Secrets include and encompass the proprietary architecture of the PWS Platform, the PWS Platform software, and PWS's aggregated data from the PWS Network;

c)  A proprietary weather alerting methodology, which includes customized weather alerts; and

d)  Application of meteorology and climatology to industries, particularly the agriculture sector, understanding and assessment of customer needs and requirements, creation of interpretation tools driven by sophisticated science, commitment to research and development, and other expertise, more specifically, the Trade Secrets include and encompass the proprietary algorithms and parameters underlying PWS's crop growth and crop risk models of the PWS Platform.

94.  PWS has expended a significant amount of time and other resources in developing its Trade Secrets and maintaining their secrecy.  PWS engages in great lengths to protect the secrecy of this information by executing confidentiality agreements, maintaining technical mechanisms to ensure the security of PWS's confidential information, labeling information as confidential, and employing passwords, computer access restrictions, and other security mechanisms to protect PWS's confidential information.

95.  PWS's Trade Secrets derive independent economic value from not being generally known and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the Trade Secrets.

96.  PWS's Trade Secrets, confidential and proprietary information and intellectual property are of great value to PWS.  Access to PWS's Trade Secrets has given Defendants (and would give any competitor) an unfair and unwarranted competitive advantage.

97.  PWS's Trade Secrets, improperly acquired and used, provide an unfair competitive advantage by: (1) not having to expend the time and resources to develop the Trade Secrets, confidential and proprietary information and intellectual property, as PWS has done; (2) enabling quick development of products and technologies to unfairly compete against PWS in

order to diminish PWS's significant head start; (3) raising substantial investment capital to finance the improper acquisition and competition with PWS; and (4) other improper advantages.

98.     In violation of PWS's rights, Defendants willfully misappropriated PWS's Trade Secrets and used the same to their own use in their efforts to provide predictive modeling for crops and agronomy in support of their insurance businesses.

99.     By receiving, improperly using, and further disclosing the foregoing PWS Trade Secrets, Defendants have misappropriated PWS's Trade Secrets in violation of 18 U.S.C. § 1836, *et seq*.

100.     Defendants have acquired, used, and continue to use PWS's Trade Secrets, knowing them to be misappropriated and obtained through deceitful means, including fraud. Such misappropriation permitted Defendants to develop and market products, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such Trade Secrets.

101.     Defendants' misappropriation of PWS's Trade Secret information has been intentional, knowing, willful, malicious, and fraudulent.

102.     If Defendants' conduct is not remedied, they will continue to misappropriate, disclose, and use for their own benefit—and to the great detriment of PWS.

103.     Because PWS's remedy at law is inadequate, PWS seeks, in addition to damages, permanent injunctive relief to recover and protect its Trade Secrets and other legitimate business interests.

104.     By reason of and as the direct and proximate result of Defendants' conduct, PWS has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

105.     PWS has been damaged by all of the foregoing, and is also entitled to an award of exemplary damages and attorneys' fees.

106.     PWS's remedy at law is inadequate to redress the harm caused by Defendants' misappropriation and to ensure that further misappropriation does not occur.  Moreover, Defendants' intentional, willful, and malicious conduct mandates that the injunctive remedy will be inadequate to prevent Defendants' future misconduct.  Therefore, PWS further seeks an order under 18 U.S.C. § 1836(b)(2) for the seizure of any and all of PWS's Trade Secrets, confidential or proprietary information and intellectual property in the possession, custody, or control of any Defendants in order to recover and protect PWS's Trade Secrets and other legitimate business interests.

## SECOND CAUSE OF ACTION

## MISAPPROPRIATION OF TRADE SECRETS UNDER

## THE KUTSA (Kan. Rev. Stat. § 60-3320, *et seq.*)

## (Against all Defendants)

107.     PWS hereby incorporates each of the foregoing Paragraphs of this Complaint, inclusive, as if set forth fully herein.

108.     PWS owns substantial Trade Secrets, as alleged above.

109.     PWS's Trade Secrets relate to products and services used, sold, and/or ordered in, or intended to be used, sold, and/or ordered in, interstate commerce including in this judicial district.  PWS's Trade Secrets include but are not limited to:

a)     A system or network of meteorological and climatological station and sensor devices, soil sensors, industry standards, network design, meteorological data, deployment and maintenance methods, protocols, and practices to assess and forecast climate and environmental patterns and conditions; more specifically, the Trade Secrets include and encompass the specific proprietary design and implementation of PWS's meteorological station and sensor devices, as well as their deployment, maintenance, and data collection protocols;

b)	Information systems and systems architecture, software development, application software and application programs, software interfaces, large-scale proprietary data and protocols for managing big data, quality assurance and control data methods and procedures, APIs, algorithm formation and modeling, graphic user and user interface design and development, and application development; more specifically, the Trade Secrets include and encompass the proprietary architecture of the PWS Platform, the PWS Platform software, and PWS's aggregated data from the PWS Network;

c)	A proprietary weather alerting methodology, which includes customized weather alerts; and

d)	Application of meteorology and climatology to industries, particularly the agriculture sector, understanding and assessment of customer needs and requirements, creation of interpretation tools driven by sophisticated science, commitment to research and development, and other expertise, more specifically, the Trade Secrets include and encompass the proprietary algorithms and parameters underlying PWS's crop growth and crop risk models of the PWS Platform.

110.	PWS has expended a significant amount of time and other resources in developing its Trade Secrets and maintaining their secrecy.  PWS engages in great lengths to protect the secrecy of this information by executing confidentiality agreements, maintaining technical mechanisms to ensure the security of PWS's confidential information, labeling information as confidential, and employing passwords, computer access restrictions, and other security mechanisms to protect PWS's confidential information.

111.	PWS's Trade Secrets derive independent economic value from not being generally known and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the Trade Secrets.

112.    PWS's Trade Secrets, confidential and proprietary information and intellectual property are of great value to PWS.   Access to PWS's Trade Secrets has given Defendants (and would give any competitor) an unfair and unwarranted competitive advantage.

113.    PWS's Trade Secrets, improperly acquired, provide an unfair competitive advantage by: (1) not having to expend the time and resources to develop the Trade Secrets, confidential and proprietary information and intellectual property, as PWS has done; (2) enabling quick development of products and technologies to unfairly compete against PWS in order to diminish PWS's significant head start; (3) raising substantial investment capital to finance the improper acquisition and competition with PWS; and (4) other improper advantages.

114.    In violation of PWS's rights, Defendants willfully misappropriated PWS's Trade Secrets and used the same to their own use in their efforts to provide predictive modeling for crops and agronomy in support of their insurance businesses.

115.    By receiving, improperly using, and further disclosing the foregoing PWS Trade Secrets, Defendants have misappropriated PWS's Trade Secrets in violation of Kan. Rev. Stat. § 60-3320, *et seq.*

116.    Defendants have acquired, used, and continue to use PWS's Trade Secrets, knowing them to be misappropriated and obtained through deceitful means, including fraud. Such misappropriation permitted Defendants to develop and market products, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such Trade Secrets.

117.    Defendants' misappropriation of PWS's Trade Secret information has been intentional, knowing, willful, malicious, and fraudulent.

118.    If Defendants' conduct is not remedied, they will continue to misappropriate, disclose, and use for their own benefit—and to the great detriment of PWS.

119.     Because PWS's remedy at law is inadequate, PWS seeks, in addition to damages, permanent injunctive relief to recover and protect its Trade Secrets and other legitimate business interests.

120.     As the direct and proximate result of Defendants' conduct, PWS has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

121.     PWS has been damaged by all of the foregoing, and is also entitled to an award of exemplary damages and attorneys' fees.

122.     PWS's remedy at law is inadequate to redress the harm caused by Defendants' misappropriation and to ensure that further misappropriation does not occur.

## DEMAND FOR JURY TRIAL

123.     Plaintiff respectfully requests a trial by jury in this action under Federal Rules of Civil Procedure 38 and 39 on all issues so triable to a jury.

124.     Plaintiff respectfully requests, pursuant to D. Kan. R. 40.2, that the trial be held in Kansas City, Kansas.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.     Judgment in Plaintiff's favor and against Defendants on all causes of action alleged herein;

2.     A preliminary and/or permanent injunction restraining Defendants, and their agents, servants, employees, attorneys, successors and assigns, and all persons, firms, and corporations acting in concert with them, from maintaining possession of, directly or indirectly disclosing, or further misappropriating or directly or indirectly using without authorization PWS's Trade Secrets and other confidential or proprietary information;

3.      An order requiring Defendants to certify, in writing, under oath, that they have returned and/or destroyed all confidential, proprietary, or PWS Trade Secret information and intellectual property, and that they no longer have any such information, or documents, photos, or any other material containing, reflecting or developed from such information, in their possession, custody, or control;

4.      Compensatory damages, according to proof, with interest thereon as provided by law;

5.      Consequential and actual damages, according to proof, or disgorgement of Defendants' profits unjustly obtained, with interest thereon as provided by law;

6.      Exemplary damages;

7.      Punitive damages;

8.      An order under 18 U.S.C. § 1836(b)(2) for the seizure of any and all of PWS's Trade Secrets and confidential or proprietary information and intellectual property, or information derived from such information, that is in the possession, custody, or control of Defendants, or that has been disclosed by Defendants, including in photographic, written, or any other form;

9.      An order under 18 U.S.C. § 1835 to preserve the confidentiality of all PWS Trade Secrets by Defendants;

10.     Pre- and post-judgment interest on all damages;

11.     Attorneys' fees;

12.     Costs of suit as provided for by law; and

13.     Such further and other relief as the Court deems just and proper.

ERISE IP

*/s/ Adam Seitz*
_____

Adam Seitz (Kansas Bar No. 21059)
Clifford Brazen (Kansas Bar No. 27408)
ERISE IP
7015 College Blvd., Suite 700
Overland Park, KS 66211
(931) 777-5604
adam.seitz@eriseip.com
cliff.brazen@eriseip.com


-and-

Ryan G. Baker (*Pro Hac Vice* Application To
Be Filed)
Jaime W. Marquart (*Pro Hac Vice* Application
To Be Filed)
Donald R. Pepperman (*Pro Hac Vice*
Application To Be Filed)
Sam S. Meehan (*Pro Hac Vice* Application To
Be Filed)
WAYMAKER LLP
515 S. Flower St., Suite 3500
Los Angeles, CA 90071
(424) 652-7800
rbaker@waymakerlaw.com
jmarquart@waymakerlaw.com
dpepperman@waymakerlaw.com
smeehan@waymakerlaw.com


*Attorneys for Plaintiff Precision Weather
Solutions Inc.*