**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **PRECISION WEATHER SOLUTIONS, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**HUDSON INSURANCE COMPANY, et al.,**<br><br>**Defendants.** | **Case No. 24-2258-DDC-GEB** |

**MEMORANDUM AND ORDER**

Plaintiff Precision Weather Solutions Inc. is a meteorology and climatology company who develops technology products used in weather-related industries. Plaintiff claims that the defendant insurance companies knowingly and improperly used plaintiff's trade secrets in their own insurance software platform—trade secrets defendants acquired through their partnership with a non-defendant company, Farmers Edge Inc. Plaintiff asserts claims under the federal Defend Trade Secrets Act (DTSA) and the Kansas Uniform Trade Secret Act (KUTSA). Defendants filed a motion to dismiss plaintiff's Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

On top of that, something else entirely now haunts plaintiff. Plaintiff failed to retain representation in this matter for a three-week-long stretch, violating a court-ordered deadline to secure counsel. During that gap, plaintiff missed a dispositive-motion deadline, failing to respond to defendants' Rule 12(b)(6) motion. Defendants wasted no time filing another motion seeking dismissal of plaintiff's case, this time for failure to prosecute under Rule 41(b).

Although plaintiff rectified things and retained new counsel, its case remains in limbo as the court weighs dismissal.

In this order, the court first decides whether to dismiss this case with prejudice for failing to prosecute and failing to comply with the court's orders under Rule 41(b). If plaintiff prevails on that motion, then the court must evaluate the merits of defendant's motion to dismiss for failure to state a claim.

## I. Failure to Prosecute (Doc. 92)

The court won't address its show-cause order separately from defendants' Rule 41(b) motion since both go to the same issue—whether the court should dismiss plaintiff's case for its failures to follow orders and prosecute this case diligently. *See* Doc. 92; Doc. 94.[1] The court starts with some background.

### A. Background

This case has a winding procedural history spanning approximately two years. Defendants previously filed a motion to dismiss under Rule 12(b)(6) and (7). Doc. 18. In September 2025, the court granted and denied that motion in part. Doc. 38. Defendants filed a motion for reconsideration. Doc. 41. Then, in June 2026, plaintiff moved for leave to file an Amended Complaint, which defendants didn't oppose. Doc. 69. The Amended Complaint made the motion for reconsideration moot. Doc. 77; *see Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (amended complaint supersedes old one, making any pending motions moot). On July 27, 2026, defendants filed a motion to dismiss the Amended Complaint, largely

[1] The court grants defendants' motion for leave to respond to plaintiff's response to the court's show-cause order. Doc. 111. Both parties bicker that the other's briefs are duplicative of one another and therefore waste the court's time. While the court agrees the briefing has taken on a bloated quality, in the interest of fairness, the court considers all filings by the parties. Regardless, the briefing war is over. The court will not find further argument useful, so it denies plaintiff leave to file a reply to defendants' response to plaintiff's response to the show-cause order. Doc. 116 at 7.

renewing the arguments they made in their first motion to dismiss. Doc. 79. This is approximately the point where the case fell off the rails. This story begins with an intellectual property law firm whose bills weren't paid.

***Counsel Withdraws from the Case***

In early July 2026, counsel for plaintiff, Erise IP, began discussions with plaintiff's CEO, Suzi Bonk, about the possibility that Erise would withdraw as plaintiff's counsel. Doc. 80-1 at 2–3. Erise formally moved to withdraw on July 28. Doc. 80. Lead attorney for plaintiff, Adam Seitz, stated the reasons for the withdrawal were that plaintiff "substantially failed to fulfill its financial obligations to Erise," and that the representation was "rendered unreasonably difficult due to irreconcilable differences . . . regarding this litigation." Doc. 80-1 at 2.

During a July 30 hearing, Magistrate Judge Gwynne E. Birzer informed Erise that she would grant their motion to withdraw, but only after they had supplemented plaintiff's trade-secrets disclosures. Doc. 91. Plaintiff had "not identified the trade secrets allegedly misappropriated with the required reasonable specificity." Doc. 88. Magistrate Judge Birzer ordered plaintiff to supplement its disclosures by August 13. *Id.* Erise submitted the supplemental trade-secrets disclosure to defendants, then moved to withdraw their representation of plaintiff. Doc. 90; Doc. 91. Both Erise and Magistrate Judge Birzer informed plaintiff that as a corporation, it couldn't continue without representation, and so plaintiff was ordered to secure new counsel before Erise withdrew. *See* Doc. 93 at 39; Doc. 80-2 at 3. Erise's motion to withdraw was granted on August 17, but no counsel appeared that day to replace them. Doc. 91.

Plaintiff's response to defendants' Rule 12(b)(6) motion was also due on August 17. Since no counsel entered an appearance, no response to defendants' motion was filed. The next day, defendants filed a motion to dismiss for failure to prosecute and failure to comply with a court order under Rule 41(b). Doc. 92. On August 24, the court stepped in, issuing a show-

cause order instructing plaintiff that it must secure counsel and respond to defendants' Rule 12(b)(6) motion within 14 days. Doc. 94 at 1–2. The court told plaintiff in no uncertain terms that its "prosecution of this case appears imperiled," and that "failing to respond to this show-cause order may result in dismissal of this case with prejudice." *Id.*

Fortunately for plaintiff, it managed to secure counsel and file the appropriate papers required by the show-cause order. Plaintiff moved for an extension of time, filed responses to both motions to dismiss, and filed a response to the show-cause order. Doc. 97; Doc. 99; Doc; 100;[2] Doc. 101. Defendants filed replies to all these issues, save for plaintiff's motion for an extension of time. Doc. 109; Doc. 110; Doc. 111. Plaintiff neglected to attach, however, an important exhibit to its motions, a declaration by plaintiff's CEO, Suzi Bonk describing her efforts to secure counsel. After defendants noted this omission, plaintiff filed the declaration as an exhibit. Doc. 112.[3] The parties subsequently engaged in some last-minute skirmishing in the briefs, with defendants moving for leave to respond to plaintiff's show-cause-order response, plaintiff filing a response to the motion for leave to respond, and defendants filing a reply to plaintiff's response to defendants' motion for leave to file a response to plaintiff's response. *See* Doc. 111; Doc. 116; Doc. 117.

---

[2] In its response to the Rule 41(b) motion, plaintiff outlined proposed amendments to the schedule intending "to request a short extension of approximately three months." Doc. 100 at 8–9. Defendants interpreted this as a motion to modify the Scheduling Order and urged the court to strike plaintiff's request for noncompliance with D. Kan. Rule 6.1(a). Doc. 110 at 7. The court interprets plaintiff's "request" as purely a tentative one, not a formal motion to modify the Scheduling Order—so the court denies defendants' request to strike plaintiff's filing on this point. Magistrate Judge Birzer since has entered an order modifying the case's schedule. Doc. 122. So, if plaintiff actually asked the court to modify the Scheduling Order, the court denies any such request as moot.

[3] The court will consider Bonk's declaration even though it was filed after defendants submitted their replies. *See* Doc. 112. Though it was filed late and not in compliance with D. Kan. Rule 15.1, the interests of justice require its consideration. Plaintiff's briefs had made the contents of this declaration clear and defendants had a chance to respond. So, the declaration surprises no one unfairly.

While waiting for the court's decision, the parties trudged on with discovery. Doc. 105; Doc. 107; Doc. 108; Doc. 118. After hearing arguments by the parties, Magistrate Judge Birzer amended the Scheduling Order, moving back important deadlines for discovery and dispositive motions. Doc. 122. Should the court deny the motions to dismiss, the case is set for trial in January 2028—about one month later than initially planned. *Compare id.*, *with* Doc. 55 at 10.

With the briefing mercifully concluded, the court now summarizes the substance of those briefs.

***Bonk's Search for New Counsel***

The parties focused on Suzi Bonk's actions and the effect of plaintiff's conduct on defendants (and the court). In her declaration, Bonk stated she began searching for "new lawyers" when her previous lawyer, Seitz, "first raised the possibility" that Erise might withdraw.[4] Doc. 112-1 at 3. Bonk found it "very difficult" to find new lawyers because she believed she needed to retain a law firm with experience in intellectual property law who regularly practices in our judicial district. *Id.* Bonk "contacted at least a dozen law firms." *Id.* Some of those firms had professional conflicts with defendant Hudson Insurance Company. *Id.* One of the firms she contacted was Foulston Siefkin LLP, and Bonk spoke to an attorney in this firm on July 31. *Id.* Foulston Siefkin cleared conflicts with plaintiff on August 6. *Id.* Then, on August 12, Bonk suddenly was informed Foulston Siefkin "was unable to take on representation of" plaintiff. *Id.* at 3–4.

Bonk says she was still looking for replacement counsel on August 17. *Id.* at 4. Evidently, she was oblivious to the deadline imposed by the court. *Id.* Bonk stated that even "if [she] had understood that [plaintiff] was still required to file a response to the motion to dismiss

---

[4] Bonk stated that the possibility Erise would withdraw was first raised "[s]ome time in July." Doc. 112-1 at 2. Seitz stated it was first raised "in *early* July." Doc. 80-1 at 2 (emphasis added).

on that day," she didn't know how to file any response on the public docket, nor did she know how to inform the court that she hadn't yet retained new counsel. *Id.* On August 21, Bonk emailed Magistrate Judge Birzer's chambers apologizing for plaintiff's failure. *Id.* In that email, Bonk wrote that she "was not aware that the Court ordered [plaintiff] to find new attorneys and respond to a motion to dismiss by" August 17. Doc. 97-4 at 4. She further explained that the "scheduling order [she] finally was able to view did not have these deadlines." *Id.* Bonk expressed unfamiliarity with "US court procedures" because she was "in Canada[.]" *Id.* Indeed, she seemed confused by the idea that a response was due on a motion to dismiss because she "was of the impression" that the motion had "already been heard and decided by the court." *Id.* at 5. Plaintiff finally retained its current counsel on September 4. Doc. 112-1 at 4.

Defendants argue in their motion that these circumstances favor dismissing plaintiff's case for its failures to follow the court's order and failure to prosecute this case diligently. Defendants also locate support for their motion in court filings in other jurisdictions; namely, the litigation in Canada between Farmers Edge and plaintiff, and two lawsuits filed against plaintiff in Virginia. In the Canadian litigation with Farmers Edge, a Manitoba trial court determined that plaintiff had "ragged the puck"[5] for 21 months and "failed to fully comply with discovery obligations and . . . meet Court-ordered deadlines." *Farmers Edge Inc. v. Precision Weather Sols. Inc.*, 2025 MBKB 113, ¶¶ 53, 15 (Man. K.B. Sept. 11, 2025), *appeal dismissed*, 2026 MBCA 63 (Man. Ct. App. June 29, 2026). Plaintiff had trouble paying its legal fees in that case—something it shares with plaintiff's performance here. *Id.* at ¶ 43 (Bonk admits plaintiff

[5] The Manitoba court's reference to "ragg[ing] the puck" likely landed more clearly in the jurisdiction where issued. But to translate for those who don't use ice hockey terms, "ragging the puck" is a phrase describing a team who retains possession of the puck "without attempting to score, as a deliberate tactic intended to use up time." *Rag the puck*, Wiktionary, https://en.wiktionary.org/wiki/rag_the_puck (last visited Nov. 9, 2026).

Precision Weather "was not in a position to pay legal fees" from 2023 to 2025); Doc. 80-1 at 2 (Erise withdrew because of plaintiff's failure "to fulfill its financial obligations"). Other companies have filed lawsuits in Virginia claiming plaintiff owes them money for legal fees. *See* Doc. 92 at 7; *e.g.*, Complaint at 1, *IPCo, LLC v. Precision Weather Sols. Inc.*, No. 1:24-CV-00123 (E.D. Va. Jan. 25, 2024) (alleging plaintiff hasn't paid back litigation loan).

**B. Legal Standard**

Defendants seek dismissal of plaintiff's case with prejudice. Doc. 92 at 14. "Rule 41(b) authorizes a district court, upon a defendant's motion, to order the dismissal of an action for failure to prosecute or for failure to comply with the Federal Rules of Civil Procedure or 'a court order.'" *Young v. United States*, 316 F. App'x 764, 771 (10th Cir. 2009) (quoting Fed. R. Civ. P. 41(b)). A court may dismiss a case with prejudice if, "after considering all the relevant factors, it concludes that dismissal alone would satisfy the interests of justice." *Ehrenhaus v. Reynolds*, 965 F.2d 916, 918 (10th Cir. 1992). Courts use a multi-factor test for determining whether dismissal with prejudice is appropriate, assessing: "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal was a likely sanction; and (5) the efficacy of lesser sanctions." *Skyline Trucking, Inc. v. Truck Ctr. Cos.*, 2024 WL 3413928, at *3 (D. Kan. July 15, 2024) (citing *Ehrenhaus*, 965 F.2d at 921).

Dismissal is "an appropriate sanction" only "when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits." *Ehrenhaus*, 965 F.2d at 921 (quotation cleaned up). "These factors do not constitute a rigid test; rather, they represent criteria for the district court to consider prior to imposing dismissal as a sanction." *Id.* The court should consider all factors under the circumstances, with some factors "tak[ing] on more

importance than others." *Id.* at 922. Dismissal usually isn't warranted for "isolated instances of noncompliance," or instances where the court doesn't specifically find "fault by the parties or intentional conduct by their attorneys[.]" *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1465 (10th Cir. 1988). Dismissal with prejudice is a "severe sanction" and "a measure of last resort." *Ecclesiastes 9:10–11–12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1143 (10th Cir. 2007) (quotation cleaned up). Such a dismissal generally "requires a finding of willfulness, bad faith, or reasonably serious fault, supported by clear evidence of misconduct." 9 *Wright & Miller's Federal Practice & Procedure* § 2369 (4th ed. 2026).

**C. Analysis**

Defendants seek dismissal of plaintiff's case with prejudice because plaintiff is culpable for a delay of proceedings that prejudiced defendants and interfered with the judicial process. Doc. 92 at 10–14. In their telling, the blame largely falls on plaintiff's CEO, Bonk. Defendants accuse her—and by extension, plaintiff—of materially misrepresenting key facts to the court. Doc. 110 at 5–6. On top of these accusations, defendants assert dismissal is warranted because plaintiff has a "broader pattern of non-diligence in prosecuting" this action. *Id.* at 8. The court evaluates whether to dismiss plaintiff's case by applying the five *Ehrenhaus* factors.

**1. Prejudice to Defendants**

The amended Scheduling Order defines the extent of any prejudice imposed by plaintiff's failure to follow the court's order to retain counsel and file a timely response to the motion to dismiss. These shortcomings delayed this case's trial date by about one month. *See* Doc. 122. This delay hurts defendants, which hinders the "timely resolution" of the case, exacerbates defendants' "reputational harm," and contributes to "mounting attorney's fees." Doc. 92 at 10. And defendants argue the scope of the prejudicial delay goes far beyond plaintiff's failure to meet the August 17 deadline. Defendants also believe plaintiff dragged its feet throughout,

including during discovery when it failed to specifically identify its trade secrets, and when it swapped counsel in 2025. *Id.* at 11.

The court isn't convinced by these two latter arguments. The first time plaintiff replaced counsel didn't cause any appreciable delay. Erise replaced plaintiff's first counsel in April 2025 while the parties were awaiting the court's ruling on the first motion to dismiss. Doc. 37. Months before that, Magistrate Judge Birzer had deferred the Rule 16 conference until after the court ruled that motion, which neither party opposed. Doc. 30. Defendants' complaint about discovery is equally unconvincing. Plaintiff's failure to identify its trade secrets with sufficient particularity was rectified when plaintiff updated its disclosures. Doc. 90. "Prejudice" within the meaning of this factor doesn't encompass anything plaintiff does that defendants simply wish it wouldn't do. Plaintiff, like any other litigant, may challenge discovery requests or replace its counsel so long as it follows the law and the court's rules in good faith.[6]

Nonetheless, the court agrees with defendants. Plaintiff's failure to meet the August 17 deadline caused an appreciable, unjustified delay. Defendants incurred significant time, effort, and expense in preparing their Rule 41(b) motion and responses because of this delay. Defendants also suffer from reputational losses as named defendants in this lawsuit. *See Ehrenhaus*, 965 F.2d at 921 ("stigmatizing allegations" against a party causes reputational damage). Plaintiff's failures ultimately will cost the parties at least a month's time. This is an unjustified delay that prejudices defendants—so, this factor favors dismissal.

**2. Interference with the Judicial Process**

Like the court's analysis of prejudice sustained by defendants, it finds that plaintiff's failures deprived the court of valuable judicial resources that it had to devote to considering this

[6] Defendants challenge plaintiff's good faith extensively. This issue is dealt with primarily under the court's analysis of the third *Ehrenhaus* factor, plaintiff's culpability. *See below* § I.C.3.

motion. If this case isn't dismissed, the parties will proceed under the extended timeline in the amended Scheduling Order, which interferes with the court's docket management and the timely resolution of cases. But the delay plaintiff has caused is less severe than cases where a party "repeatedly ignored court orders," which creates greater unpredictability and burdens on the court's management of its docket. *See Jones v. Thompson*, 996 F.2d 261, 265 (10th Cir. 1993). The court notes that while any unauthorized delay is a concerning deviation, a one-month delay won't have a terribly meaningful effect on the court's docket. The court regularly grants parties weeks-long or even months-long extensions to respond to dispositive motions. *See, e.g.*, Doc. 17 (granting *defendants* unopposed two-month extension to respond to Complaint); Doc. 75 (granting *defendants* two-week extension to respond to Amended Complaint) So, this factor only favors dismissal slightly.

### 3. Plaintiff's Culpability

Defendants argue that plaintiff is highly culpable because it was aware of the court's deadlines and made misrepresentations to the court. They claim Bonk materially misrepresented her knowledge when she said "she did not fully understand" that plaintiff's response was due on August 17. Doc. 110 at 6. Ultimately, the court doesn't find clear evidence that plaintiff or Bonk made material misrepresentations to the court.

Bonk's statement that she "did not fully understand" a response was due on August 17 seems unlikely at first glance because her attorney, Seitz, informed her specifically of that deadline. Doc. 80-3 at 2 (July 28 email from Seitz). But Seitz also emailed her the Scheduling Order on July 27, which—critically—did not include the August 17 deadline. *See* Doc. 80-2 at 2–3. It appears Bonk got confused; she emailed the court apologizing for missing the August 17 deadline, saying "[t]he scheduling order I finally was able to view did not have these deadlines." Doc. 98-4 at 4. Bonk also wrote she "was of the impression" the motion to dismiss had "already

been heard and decided by the court," referring perhaps to the court's September 2025 ruling on defendants' first motion to dismiss. *Id.* at 5.

To a non-lawyer, even a sophisticated one such as Bonk, it might reasonably come as a surprise to learn that amending the complaint permitted defendants to file a new motion to dismiss making substantially the same arguments the court already had decided. It appears Bonk overlooked the August 17 deadline because she only reviewed Seitz's July 27 email and, perhaps, the Scheduling Order itself, neither of which made any reference to the motion to dismiss. Doc. 80-2 at 2–3. Granted, the word "fully" is doing a lot of heavy lifting in Bonk's unhelpfully opaque statement that she "did not fully understand" there was an impending deadline. One of three things likely is true: Bonk knew about the deadline; she didn't know about it; or she once knew about the deadline but had forgotten about it. But the record contains no evidence clearly establishing that Bonk *did* know about the deadline and thus lied in her declaration. On this record, the court can't infer bad faith or conclude that plaintiff materially misrepresented facts. *See Wright & Miller* § 2369 ("clear evidence of misconduct" generally necessary to support Rule 41(b) dismissal).

The sparring over Bonk's declaration is a sideshow to the real issue, anyway, which requires the court to address whether plaintiff intentionally and willfully flouted the August 17 deadline. This latter question is most probative of plaintiff's culpability that might justify dismissal. Plaintiff failed to respond to the motion to dismiss by August 17 because it didn't have counsel. And there is evidence that Bonk did conduct a search for replacement counsel beginning "[f]rom the time in July that Mr. Seitz first raised the possibility of Erise withdrawing[.]" Doc. 112-1 at 3. Bonk "contacted at least a dozen law firms." *Id.* As an example of these efforts, plaintiff submitted an exhibit showing Bonk contacted an attorney at

Foulston Siefkin LLP and came close to securing representation by that firm. Doc. 99-3 at 2–6. The court isn't surprised that plaintiff had trouble securing new counsel, given its history of replacing counsel and its apparent difficulty with compensating counsel. The need for an intellectual property firm with a presence in Kansas who wasn't conflicted with defendant Hudson Insurance Company compounded those difficulties. *See* Doc. 112-1 at 3.

Overall, the court finds that plaintiff didn't willfully or deliberately violate the court's order to retain counsel. Could Bonk have acted more proactively to secure replacement counsel? It seems so, as the earliest evidence of her contacting attorneys to replace Erise occurred on July 31. Doc. 99-3 at 6. Plaintiff is fully responsible for these shortcomings—it must diligently prosecute its case in compliance with the court's orders. But the court finds that plaintiff's efforts to acquire replacement counsel were made in good faith. Culpability is lessened where a party's failures were in part caused by "external forces" outside its control. *See, e.g.*, *Armstrong v. Swanson*, 2009 WL 1938793, at *4 (D. Colo. July 2, 2009). Although much of what happened here was within plaintiff's control, Bonk was attempting to find new counsel and comply with the court's orders, which lessens plaintiff's culpability. The court also finds it significant that this is the first time where plaintiff violated the court's rules and caused appreciable delay. Normally, a party isn't punished with the heavy blow of dismissal with prejudice based on one such mistake. An "isolated instance[] of noncompliance" doesn't favor dismissal. *Ocelot Oil*, 847 F.2d at 1465.

#### 4. Warning from the Court

Magistrate Judge Birzer warned plaintiff orally that failure to comply with the court's orders could result in dismissal, so plaintiff was on notice that dismissal was a possibility. Doc. 93 at 39. This was the first time plaintiff was warned. In its show-cause order, the court warned plaintiff in writing that its case faced dismissal if plaintiff didn't secure counsel and respond

within 14 days. Doc. 94 at 2. Plaintiff heeded that second warning. After the show-cause order, plaintiff secured counsel and filed its responses within the 14-day period allowed by that order. This factor supports dismissal, but only slightly, because plaintiff's infractions occurred after the court's first warning and plaintiff subsequently corrected its noncompliance after the court's second warning.

### 5. Efficacy of Lesser Sanctions

Dismissal is "not ordinarily warranted if lesser sanctions would be effective." *Ehrenhaus*, 965 F.2d at 922. Initially, defendants argued that no lesser sanction would suffice because plaintiff still didn't have counsel, and plaintiff as a corporation can't appear in this action pro se. Doc. 92 at 14. But plaintiff now has retained counsel, so defendants argue dismissal is the only effective remedy because plaintiff's conduct "reflects a broader pattern of non-diligence prosecuting its claims," such as its lack of participation in "almost any discovery" and repeated "misstatements and unsupported assertions." Doc. 110 at 8; *see Jones*, 996 F.2d at 265–66 (pattern of repeatedly ignoring court orders favors dismissal).

These aren't impressive arguments. There isn't a "pattern of non-diligence" by plaintiff in this lawsuit—violating a court order once doesn't constitute a "pattern." As already discussed, defendants attempt to make a pattern out of plaintiff's behavior by claiming they've dragged their feet throughout the whole case. But plaintiff is not solely responsible for this case's elongated timeline. *See above* § I.C.1. Defendants didn't oppose staying the Rule 16 conference, which put the brakes on discovery for more than nine months. Doc. 30. Defendants also filed a Motion for Reconsideration, which took considerable time before it became moot. *See* Doc. 41; Doc. 77. When plaintiff asked for leave to file its Amended Complaint, defendants didn't oppose granting leave. Doc. 69 at 1. And plaintiff isn't blameworthy for replacing

counsel the first time in April 2025, which caused no delay. There wasn't anything untoward in plaintiff's prosecution of this case up until this incident with counsel's withdrawal.

Even if defendants had proved a pattern of feet-dragging in this case, they haven't overcome the possibility that lesser sanctions would cure plaintiff's non-diligence. For example, when defendants pressed the issue on plaintiff's trade-secrets disclosures, the court ruled in their favor. And plaintiff provided the required disclosures. Doc. 88; Doc. 90. Defendants haven't requested any discovery sanctions. The court concludes there isn't a pattern of non-diligence by plaintiff favoring application of the "severe" and disfavored penalty of dismissal with prejudice. *Ecclesiastes*, 497 F.3d at 1143. This factor weighs strongly against dismissal.

### D. Weighing the *Ehrenhaus* Factors

Mindful of our Circuit's "strong predisposition to resolve cases on their merits," *Ehrenhaus*, 965 F.2d at 921 (quotation cleaned up), the court declines to dismiss plaintiff's case under Rule 41(b). The evidence doesn't establish that plaintiff willfully flouted the court's orders or that Bonk intentionally deceived the court. Bonk was searching for counsel, at latest, by late July. She should have begun reaching out to law firms much sooner—but on this record the court doesn't infer bad faith on her part. Plaintiff is culpable for its mistakes, which did lead to considerable delay. And yet this is the first time plaintiff has caused unjustified delay in this action, and its culpable conduct is thus far limited to this incident. Plaintiff heeded the court's second warning in the show-cause order. These circumstances don't justify dismissal at this stage. *See Skyline Trucking*, 2024 WL 3413928, at *4–5 (dismissing case where plaintiff repeatedly ignored court orders to retain counsel, participate in discovery, or respond to the Rule 41(b) motion, and was warned seven months ago).

Defendants labor to paint a picture of a plaintiff with a serious penchant for non-diligence, in this case and others. The pigment for their picture comes from three sources: other

litigation involving plaintiff, plaintiff's first set of replacement counsel, and the discovery disputes. From the other litigation, defendants import accusations and court orders showing plaintiff's "puck-ragging" and feet-dragging in Canada and Virginia. These other cases aren't especially probative—the circumstances here differ sufficiently from what happened in plaintiff's Canadian litigation, and the other lawsuits against plaintiff don't prove much.[7]

Looking at plaintiff's track record in *this* case, defendants' grievances about plaintiff's initial counsel switch and the parties' discovery battles both lack merit. When a court order was issued concerning plaintiff's trade-secret disclosures, plaintiff promptly handed over the required disclosures. Plaintiff hasn't caused any additional, inexcusable delays. It broke no rules when it filed an Amended Complaint—unopposed—or when it retained new counsel in April 2025. Apart from its recent three-week lapse of counsel, plaintiff's behavior doesn't represent

---

[7] In the Canadian litigation, the Manitoba court struck plaintiff's claims for failure to prosecute. *Farmers Edge*, 2025 MBKB 113, ¶ 24. Both parties agreed—plaintiff conceded—that it had repeatedly failed to participate in discovery or follow court orders and procedural rules. *Id.* at ¶ 18. The Manitoba court had before it substantial evidence that plaintiff "essentially ragged the puck" for years and didn't "prioritize[] the Manitoba action with demonstrated, tangible, necessary deeds to advance this action." *Id.* at ¶ 53. Both parties also agreed that holding a trial on plaintiff's counterclaim would require at least a two-year delay—in a case that was entering its tenth year of litigation. *Id.* at ¶ 21.

The factual circumstances here differ enough that they don't warrant dismissal. Plaintiff dropped the ball in August by failing to retain counsel as ordered. There's no doubt about that part. But before and after that point, plaintiff has done the "necessary deeds to advance this action," unlike the Canadian litigation. *Id.* Also, plaintiff's errors aren't remotely as prejudicial here as they were in the Canadian case, where plaintiff needed an extra *two years* to try its claims. That's why the court disagrees with defendants that the Canadian litigation seals plaintiff's fate here.

In addition, defendants cannot offer documents filed in the other lawsuits filed against plaintiff "'to prove the truth of matters asserted therein'"—not even if the court took judicial notice of them, which it will not. *Bruce v. City & County of Denver*, 57 F.4th 738, 742 n.3 (10th Cir. 2023) (quoting *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006)). Defendants cite two complaints filed against plaintiff seeking payment of attorneys' fees and repayment of a litigation loan. *See* Doc. 111-1 at 8. The complaints contain unproven allegations. Neither one establishes credible factual information the court properly can rely on to decide this motion. And even if the allegations in them are indeed true, it proves merely that plaintiff faces difficulty with compensating counsel, which the court already knows from its financial difficulty with Erise.

"dilatoriness during the discovery process that [goes] beyond a mere 'discovery dispute[.]'" *Ecclesiastes*, 497 F.3d at 1146. This isn't a case where plaintiff has "made no meaningful effort to advance [the] action," nor has plaintiff "disregarded several Orders[.]" *Armstrong*, 2009 WL 1938793, at *4.

All said, plaintiff has found its way onto a thinner layer of ice. The court will not tolerate future unjustified delays by plaintiff. Another failure to respond to a dispositive motion will very likely prove fatal to plaintiff's claims. But our Circuit has espoused a strong preference for resolving claims on the merits, so the court gives plaintiff its last chance. Plaintiff is warned: **If plaintiff fails to timely respond to dispositive motions, fails to retain counsel at all times, or otherwise violates the court's orders, the court likely will dismiss its case with prejudice**.

With the Rule 41(b) question resolved, the court now turns to defendants' Rule 12(b)(6) motion.

## II. Failure to State a Claim (Doc. 79)

### A. Background

The court begins with the facts of the case, drawn from plaintiff's Amended Complaint. Doc. 73.

Plaintiff Precision Weather Solutions Inc. is a high-tech business specializing in "precision meteorology and climatology." Doc. 73 at 4 (Am. Compl. ¶ 13). Plaintiff develops and maintains "proprietary standardized stations and sensors for the observation of weather and soil," and a "private network that generates high quality meteorological data." *Id.* at 4 (Am. Compl. ¶ 15). Plaintiff integrated its "sophisticated backend infrastructure" into a proprietary "Platform" that "encompasses proprietary software, applications, methods, models, algorithms and other intellectual property." *Id.* This platform and plaintiff's associated services are built on trade secrets developed over several years. *Id.* at 4–5 (Am. Compl. ¶ 16). Those trade secrets

include: meteorological and climatological station and sensor devices; network design; data, methods, protocols, and forecasting of climate and environmental patterns and conditions; other "[i]nformation systems and systems architecture"; "proprietary algorithms and parameters underlying [plaintiff's] crop growth and crop risk models"; and methods of applying meteorology and climatology to the agricultural sector. *Id.* at 5 (Am. Compl. ¶ 16(a)–(d)).

Years ago, plaintiff entered into several agreements with a company called Farmers Edge. *Id.* at 7 (Am. Compl. ¶ 25). Farmers Edge made these contracts with the intent to steal plaintiff's trade secrets in an act of "brazen misappropriation." *Id.* at 7–8 (Am. Compl. ¶ 26). Farmers Edge lacked "internal capability, expertise, or resources to develop competitive software" of its own, without which it "faced inevitable failure." *Id.* at 7 (Am. Compl. ¶ 21). Farmers Edge "misled and deceived customers and investors" by claiming it was developing a platform called FarmCommand. *Id.* (Am. Compl. ¶ 23). Since Farmers Edge couldn't develop a competitive, successful product on its own, Farmers Edge planned to build FarmCommand by misappropriating plaintiff's trade secrets. *Id.* at 7–8 (Am. Compl. ¶ 26). Farmers Edge used plaintiff's trade secrets to develop the FarmCommand platform by securing unauthorized access to plaintiff's platform for its employees. *Id.* at 8–13 (Am. Compl. ¶¶ 29–48).

After FarmCommand was completed successfully, Farmers Edge used it to build a secondary platform called InsurTech.[8] *Id.* at 14 (Am. Compl. ¶ 53). The defendants—Hudson Insurance Company, Odyssey Group Holdings, Inc. (Odyssey), and Odyssey Reinsurance Company (ORC)—helped Farmers Edge deploy, use, and promote InsurTech. *Id.* at 14–16 (Am. Compl. ¶¶ 53–58). Hudson is a subsidiary of ORC, and ORC a subsidiary of Odyssey. *Id.* at 14

[8] Plaintiff was mired in "uncompromising litigation" against Farmers Edge in Canada for more than ten years. *Farmers Edge*, 2025 MBKB, ¶ 1. Farmers Edge had sued plaintiff, and plaintiff filed a counterclaim against them for intellectual property infringement based on plaintiff's trade secrets. *Id.* at ¶ 12.

(Am. Compl. ¶ 53). Odyssey itself has a parent company called Fairfax Financial Holdings, Ltd. *Id.* Farmers Edge "partnered with Hudson to deploy and use InsurTech throughout the United States in Hudson's lucrative crop insurance business." *Id.* (Am. Compl. ¶ 54). The "datasets," "predictive tools," and "digital infrastructure" built into InsurTech were "stolen directly from" plaintiff. *Id.* at 14–15 (Am. Compl. ¶ 54).

Odyssey and ORC also were involved in "the advertising and selling of InsurTech." *Id.* at 15 (Am. Compl. ¶ 55). Odyssey issued a press release praising the partnership that its subsidiary, Hudson, had formed with Farmers Edge. *Id.* Hudson is the "insurance division" of Odyssey and owned by ORC. *Id.* ORC and Odyssey both underwrite insurance—Odyssey is a "worldwide underwriter of property and casualty reinsurance and specialty insurance," which it does through its "operating reinsurer, ORC." *Id.* at 16 (Am. Compl. ¶ 59).

Plaintiff claims that defendants must have known that InsurTech improperly incorporated plaintiff's trade secrets because of other litigation involving plaintiff. Plaintiff asserts that defendants learned or should have learned of Farmers Edge's misappropriation through its "ongoing multiple intellectual property-related litigations involving" Farmers Edge. *Id.* at 23 (Am. Compl. ¶ 84).

Defendants' Rule 12(b)(6) motion largely reasserts theories that the parties previously litigated in the first motion to dismiss, which the court granted and denied in part. *See* Doc. 38. The court held that plaintiff had stated a claim against defendants but only for claims arising after July 12, 2021, the day when the Virginia litigation against Farmers Edge commenced, which put defendants on notice of plaintiff's trade secrets allegedly embedded into InsurTech. *Id*. at 18. Defendants filed a motion to reconsider that decision, which became moot after the Amended Complaint was filed. Doc. 41; Doc. 77 at 1–2. The Amended Complaint is

substantially similar to the initial complaint but added an additional defendant, ORC. Doc. 79 at 16. Defendants' latest Rule 12(b)(6) motion renews their arguments that the Virginia litigation didn't furnish adequate notice of plaintiff's alleged trade secrets. *Id.* at 13–15. Defendants also argue the Amended Complaint doesn't allege plausibly that newly-added defendant ORC used, acquired, or disclosed plaintiff's trade secrets. *Id.* at 17–19.

**B. Legal Standard**

A party may move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive a Rule 12(b)(6) motion to dismiss, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

When considering a Rule 12(b)(6) motion, the court must assume that factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

The court now applies this standard to the Amend Complaint, analyzing whether it alleges a plausible claim to relief.

### C. Analysis

The elements of misappropriation claims under the DTSA and KUTSA "are essentially the same": Plaintiff must allege "(1) the existence of a trade secret; (2) the acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or disclosing the trade secret knew or should have known the trade secret was acquired by improper means." *API Ams. Inc. v. Miller*, 380 F. Supp. 3d 1141, 1148 (D. Kan. 2019) (footnote omitted); *see* 18 U.S.C. § 1839(5) (defining trade-secret misappropriation).[9] The parties don't separate their KUTSA and DTSA arguments, so the court also analyzes them together. *See Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1088 n.8 (10th Cir. 2025) (analyzing DTSA and Oklahoma trade-secret claims together).

Defendants don't challenge the existence of plaintiff's trade secrets at this stage. Doc. 79 at 12 n.5 (reserving right to challenge whether plaintiff really possesses trade secrets under the DTSA and KUTSA). And for its part, plaintiff doesn't renew its "previously dismissed theories" in support of the Amended Complaint, so the court doesn't address those arguments a second time. Doc. 101 at 12–13; Doc. 38 at 10–14 (rejecting allegations that defendants knew or had reason to know of plaintiff's trade secrets based on due-diligence requirements and investment relationships with Farmers Edge).

That leaves defendants' motion with two principal arguments: (1) that the Amended Complaint fails to allege plausibly that they should have known about plaintiff's Virginia lawsuit, and (2) plaintiff fails to allege plausibly that ORC acquired, disclosed, or used plaintiff's trade secrets. Doc. 79 at 13, 17. Their first argument is one already considered and rejected by

---

[9] Trade-secrets claims under the federal DTSA require one additional element: The trade secret must "relate[] to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). This element isn't at issue here.

the court. Doc. 38 at 16–18. Defendants' second contention echoes one they made before, but this time against a new defendant, ORC. Doc. 19 at 6–8; *see also* Doc. 77 at 1 (stating that the Amended Complaint "largely mirrors the original complaint" and same arguments apply to it). The court considers defendants' arguments below.

**1. Knowledge**

Plaintiff contends that defendants had reason to know of its trade secrets once the Virginia lawsuit was filed. Doc. 101 at 10. A lawsuit can serve to put a party on notice of trade-secret misappropriation. In *Metallurgical Industries, Inc. v. Fourtek, Inc.*, one defendant agreed to build a novel furnace for another defendant, Smith International, Inc. 790 F.2d 1195, 1198 (5th Cir. 1986). The defendant who built the novel furnace allegedly had stolen plaintiff's trade secrets to design the furnace. *Id.* Plaintiff adduced evidence that defendant Smith International had notice that plaintiff claimed ownership of the furnace design in a separate lawsuit. *Id.* at 1204. The Fifth Circuit explained that "a reasonable jury could find that Smith should have inquired into the relationship between" plaintiff and the defendant who built the furnace. *Id.* *Metallurgical Industries* thus held that a company who learns—through litigation— that another party claims trade-secret ownership of a product used by that company may not turn a blind eye to that asserted ownership without risking liability. *See Pie Dev., LLC v. Pie Carrier Holdings, Inc.*, 128 F.4th 657, 665 (5th Cir. 2025) ("Because ongoing litigation 'put defendant on inquiry and an inquiry pursued with reasonable intelligence and diligence would disclose the facts,' the defendant could be held liable for misappropriation." (quotation cleaned up) (quoting *Metallurgical Indus.*, 790 F.2d at 1204)).

Earlier litigation suffices to provide notice in other contexts as well. The existence of "[p]ublicly available documents may . . . charge a [party] with constructive knowledge." *Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024, at *13 (D. Utah May 17, 2018). "For

example, in cases alleging securities fraud, investors had reason to track the companies in which they invested." *Id.* (citing *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201, 1203 (10th Cir. 1998)). Whether a party possesses constructive knowledge of a certain fact depends on the circumstances, which include the party's level of sophistication, the extent information was known or widely disseminated in the press, and whether significant material information was revealed to the party. *See id.* (finding constructive notice harder to establish for "individual consumers" who had no reason to research legal ramifications of small online purchases).

Here, defendants argue that plaintiff hasn't alleged sufficient facts showing that defendants should've been aware of the Virginia litigation and thus aware that the platform Farmers' Edge helped develop—InsurTech—was built based on plaintiff's trade secrets. Doc. 79 at 14–15. Investors are only on notice of litigation against companies they invest in "when that information is 'reasonably accessible to the ordinary investor.'" *Id.* at 15 (quoting *Thompson*, 2018 WL 2271024, at *13). So, defendants say, "even if Defendants were aware of the Virginia litigation . . . they would not have been able to determine whether Farmers Edge's technology resembled [plaintiff]'s technology in any way." *Id.* at 14. To find defendants were on constructive notice here "would impose an unreasonable duty of knowledge and diligence on all investors by requiring them to monitor all nationwide court filings for unproven allegations against any company with which they do business." *Id.*

Defendants' arguments parade too many hypothetical horribles and misapprehend the scope of what plaintiff must allege. The court agrees. Defendants weren't required to screen all court filings nationwide to discern all allegations made against companies with whom they conduct business. But plaintiff makes a plausible allegation of knowledge when a reasonably

diligent inquiry by defendants would have disclosed the facts showing they are subject to liability. *See Pie Dev.*, 128 F.4th at 665.

Here, the Amended Complaint plausibly alleges that defendants knew—or, at worst, should have known—they were using plaintiff's trade secrets because of the Virginia lawsuit. Doc. 73 at 23 (Am. Compl. ¶ 84) (alleging ongoing litigations made defendants "well aware" of Farmers Edge's misappropriation). In the Virginia litigation, plaintiff specifically alleged Farmers Edge used its trade secrets to build InsurTech. *See* Complaint at ¶¶ 52–53, *Precision Weather Sols., Inc. v. Farmers Edge Inc.*, No. 21-cv-00821-LO-IDD (E.D. Va. July 12, 2021). The allegations mentioned InsurTech by name eight times—and each time, the allegations either insinuated or accused directly that InsurTech incorporates plaintiff's misappropriated trade secrets. *Id.* at ¶¶ 18, 23, 42, 52, 53; *see also id.* at ¶ 53 (mentioning defendant Hudson by name).

The Virginia litigation provides an adequate basis for a reasonable jury to find that an "inquiry pursued with reasonable intelligence and diligence" would have "disclosed the facts" to defendants indicating exposure to trade-secrets liability. *Pie Dev.*, 128 F.4th at 665. Defendants are sophisticated business entities. On these alleged facts, holding otherwise would let sophisticated entities off the hook—at the motion-to-dismiss stage—for trade-secret misappropriation they had "reason to know" they were complicit in. § 1839(5)(A)–(B). Thus the Amended Complaint plausibly alleges that defendants "should have inquired" whether their activities constituted misappropriation of plaintiff's trade secrets. *Metallurgical Indus.*, 790 F.2d at 1204.

Defendants struggle to distinguish *Thompson*, *Metallurgical Industries*, and *Pie Development*. Doc. 79 at 14; Doc. 41 at 8–12. The court finds defendants' efforts unavailing. The court cites *Thompson* only for the modest proposition that litigation can provide constructive

notice to the parties. *Thompson*, 2018 WL 2271024, at *13. As one would expect, an investment relationship with a misappropriating party alone doesn't trigger notice in the trade-secrets context. But here, plaintiff alleges much more. It asserts defendants knew about the litigation against Farmers Edge that specifically referred to InsurTech. At this stage, the court must accredit this allegation. And defendants' attempt to distance this case from *Metallurgical Industries* fares no better. The Fifth Circuit makes the point that matters: "[In *Metallurgical Industries*], we held that, because trade secret litigation was ongoing, defendants who obtained the alleged trade secret from another entity 'should have inquired' into whether the trade secret had been misappropriated." *Pie Dev.*, 128 F.4th at 665. Regardless of the precise outcome of each case, the underlying principle of law is firmly established. Ongoing trade-secret litigation can charge another entity with constructive notice of their own trade-secret misappropriation. *See id.*

Earlier, the court held that plaintiff's Complaint didn't plausibly allege that defendants had knowledge of its trade secrets before July 12, 2021, the day when the Virginia litigation began. Doc. 38 at 25. Now, the Amended Complaint alleges that some of defendants' conduct occurred before that date. *See* Doc. 73 at 14–15 (Am. Compl. ¶¶ 53–56). But plaintiff doesn't renew its arguments on that front, and the court stands by the analysis in its earlier order. So, the court dismisses any trade-secrets claim against defendants arising from conduct occurring before July 12, 2021.

Next, the court evaluates whether the Amended Complaint plausibly alleges that ORC "used" plaintiff's trade secrets.

**2. Use**

Plaintiff also must plausibly allege that defendants "acqui[red], use[d], or disclos[ed]" its trade secrets without consent. *API Ams. Inc.*, 380 F. Supp. 3d at 1148. "Use" of a trade secret is

"any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant." Restatement (Third) of Unfair Competition § 40 cmt. c (A.L.I. 1995). "[M]arketing goods that embody the trade secret, employing the trade secret in manufacturing or production . . . or soliciting customers through the use of information that is a trade secret . . . all constitute 'use.'" *Id.* Misappropriation of a trade secret through "use" "generally contemplates some type of use that reduces the value of the trade secret" and harms the owner's interest in the "'exclusive rights to, and the continued secrecy of'" the trade secret. *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1130 (9th Cir. 2010) (quoting 1 Trade Secrets Law § 3:20). To incur trade-secret liability, the defendant must have "received some sort of unfair trade advantage," or "'put the trade secret to some commercial use.'" *Id.* (first quoting *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1325 (5th Cir. 1994); and then quoting *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974)). Unauthorized use can occur if the resulting product defendants use is "substantially derived from the trade secret." Restatement (Third) of Unfair Competition § 40 cmt. c.

Defendants here argue the Amended Complaint doesn't plausibly allege that ORC acquired, disclosed, or used any trade secrets belonging to plaintiff. Doc. 79 at 17. Defendants don't make this argument for Hudson or Odyssey—although they do claim the Amended Complaint makes only group allegations against all defendants, failing to "clarify which acts" give rise to liability for each defendant. *Id.* at 12–13. These attacks lack merit. The Amended Complaint makes specific allegations about each defendant. *See* Doc. 73 at 14–16 (Am. Compl. ¶¶ 53–59) (alleging that ORC and Odyssey advertise and sell InsurTech, Hudson partnered with Farmers Edge and promoted FarmCommand, and all three use InsurTech in their crop insurance business). The court previously considered and rejected similar arguments about plaintiff's

allegations that defendants "used" its trade secrets. Doc. 38 at 6 (holding that the original Complaint plausibly alleged use).

The court holds that plaintiff plausibly alleges ORC, no less than the other defendants, used plaintiff's trade secrets through insurance underwriting as well as sale and promotion of InsurTech.[10] Doc. 73 at 15 (Am. Compl. ¶ 55) (alleging ORC was "involved in the advertising and selling of InsurTech"). ORC is the "principal operating subsidiary of Odyssey and [ORC] owns all of the common shares of Hudson," meaning it sits between Hudson and Odyssey in the corporate hierarchy. *Id.* at 14 (Am. Compl. ¶ 53). Moreover, plaintiff alleges ORC is Odyssey's "operating reinsurer" for the underwriting of reinsurance and insurance. *Id.* at 16 (Am. Compl. ¶ 59). There's no doubt plaintiff Hudson was using InsurTech directly, which allegedly was built on plaintiff's misappropriated trade secrets: Farmers Edge "partnered with Hudson to deploy and use InsurTech throughout the United States in Hudson's lucrative crop insurance business." *Id.* at 14 (Am. Compl. ¶ 54). Odyssey promoted the partnership between Hudson and Farmers Edge in a press release. *Id.* at 15 (Am. Compl. ¶ 55).

Based on these alleged facts, plaintiff has alleged sufficiently that ORC "used" plaintiff's trade secrets because it underwrites insurance in its business alongside its subsidiary, Hudson, and its parent company, Odyssey. Hudson is the entity who partnered directly with Farmers Edge, but plaintiff alleges that InsurTech is used in defendants' insurance business writ large. *Id.* at 16 (Am. Compl. ¶ 57) ("Defendants' crop agents used InsurTech in performing their crop insurance business."). It follows that ORC, itself an underwriter as well as a promoter and seller

[10] Defendants assert that ORC and Odyssey don't offer insurance in the United States at all, and that Hudson is the only entity authorized to do so. Doc. 79 at 18. But this argument is no more than an invitation to do fact-finding at the motion-to-dismiss stage. Defendants know well that the court must accept the Amended Complaint's plausible allegations as true at this stage. *Iqbal*, 556 U.S. at 678; *see* Doc. 101 at 10 (arguing defendants' claims fall "outside of the pleadings.").

of InsurTech, plausibly devoted InsurTech to "commercial use" and derived "unfair trade advantage" from plaintiff's trade secrets embedded into InsurTech. *JustMed*, 600 F.3d at 1130 (quotation cleaned up). These allegations, if true, constitute "use" of plaintiff's alleged trade secrets under the DTSA and KUTSA.

Finally, defendants argue the allegations against ORC are limited just to "advertising activities," which, they assert, doesn't qualify as a trade-secret injury. *See* Doc. 79 at 18 (citing *Winklevoss Consultants, Inc. v. Fed. Ins. Co.*, 991 F. Supp. 1024, 1033 (N.D. Ill. 1998)). This argument is of no moment here. As the court explained above, ORC's involvement—as alleged—wasn't limited to merely advertising. Additionally, *Winklevoss* is distinguishable. That case held that certain trade-secret violations weren't committed "in the course of advertising" under a general commercial liability policy. *Winklevoss*, 991 F. Supp. at 1030. *Winklevoss* doesn't attempt to define—or even mention—what sort of use, acquisition, or disclosure is necessary to constitute trade-secret misappropriation. So, defendants misplace their faith in *Winklevoss*. Plaintiff has stated a plausible claim against ORC.

## III. Conclusion

The court grants plaintiff's motion for an extension of time, grants defendants' motion for leave to respond to plaintiff's show-cause order response, denies plaintiff's motion for leave to reply to defendants' response, and denies defendants' motion to dismiss for failure to prosecute.

The court grants the motion to dismiss for failure to state a claim in part and denies it in part, dismissing any of plaintiff's claims arising from conduct occurring before July 12, 2021. Any requests before this court to modify the Scheduling Order are denied; the parties must direct any such motions to the magistrate judge. Defendants' request to strike plaintiff's filing, Doc. 110 at 7, is also denied.

The court is not dismissing plaintiff's case today despite its significant mistakes with retaining counsel. But plaintiff can't afford to make any more such mistakes.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Motion for Extension of Time to File Response to Motion to Dismiss for Failure to State a Claim (Doc. 97) is **GRANTED**. Plaintiff's Response retroactively is due on September 8, 2026.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Dismiss for Failure to Prosecute or Comply with a Court Order (Doc. 92) is **DENIED**.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Dismiss for Failure to State a Claim (Doc. 79) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED THAT** defendants' Motion for Leave to File Response to plaintiff's Response to the court's Show Cause Order (Doc. 111) is **GRANTED**.

**IT IS FURTHER ORDERED THAT** plaintiff's request to reply to defendants' response to the court's show-cause order (Doc. 116 at 7) is **DENIED**. All other pending requests to submit further briefing on the issues taken up in this Order are denied. Any pending request by plaintiff to amend the Scheduling Order is denied. Defendants' request to strike plaintiff's filing is denied. All matters relating to amendment of the Scheduling Order are referred to the magistrate judge.

**IT IS SO ORDERED.**

**Dated this 12th day of November, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**